RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 12a0286p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,
　　　　　　　　*Plaintiff-Appellee,*

　　　*v.*

No. 11-5722

FRANKLIN DELANO JEFFRIES, II,
　　　　　　　　*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 3:10-cr-100-1—Thomas W. Phillips, District Judge.

Argued: July 17, 2012

Decided and Filed: August 27, 2012

Before: SUTTON and GRIFFIN, Circuit Judges; DOWD, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Jonathan Harwell, HARWELL & HARWELL, P.C., Knoxville, Tennessee, for Appellant. Luke A. McLaurin, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee. **ON BRIEF:** Jonathan Harwell, Ralph E. Harwell, HARWELL & HARWELL, P.C., Knoxville, Tennessee, for Appellant. Luke A. McLaurin, Kelly A. Norris, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee.

　　　SUTTON, J., delivered the opinion of the court in which GRIFFIN, J., and DOWD, D. J., joined. SUTTON, J. (pp. 16–20), also delivered a separate dubitante opinion.

_____

[*] The Honorable David D. Dowd, Jr., Senior United States District Judge for the Northern District of Ohio, sitting by designation.

1

———————————————

**OPINION**

———————————————

SUTTON, Circuit Judge.  Tangled in a prolonged legal dispute over visitation rights to see his daughter, Franklin Delano Jeffries II tried something new.  He wrote a song.  The title, "Daughter's Love," gives away half of the lyrics.  The song contains sweet passages about relationships between fathers and daughters and the importance of spending time together.  The rest boils into an assortment of the banal (complaints about his ex-wife), the ranting (gripes about lawyers and the legal system) and the menacing (threats to kill the judge if he doesn't "do the right thing" at an upcoming custody hearing).  Jeffries set the words to music and created a video of himself performing the song on a guitar painted with an American flag on it.  The style is part country, part rap, sometimes on key, and surely therapeutic.  Had Jeffries left it at that, there would be nothing more to say.

But he did not.  He posted the music video on YouTube and shared it with friends, family and a few others.  The timing left something to be desired.  Six months earlier, the judge assigned to his custody case, Knox County Chancellor Michael Moyers, had granted Jeffries' petition for unsupervised visits.  For reasons the record does not fully disclose, the judge set a hearing to re-evaluate Jeffries' visitation rights.  Five days before the scheduled hearing, Jeffries uploaded the video.

In the video, Jeffries sings of his upcoming visitation hearing and directs his words to Chancellor Moyers, saying, "This song's for you, judge."  Here are the lyrics of the song in full, a few of which Jeffries speaks rather than sings:

> I've had enough of this abuse from you.
> It has been goin' on for 13 years.
> I have been to war and killed a man.
> I don't care if I go to jail for 2,000 years.
> 'Cause this is my daughter we're talkin' about,
> *And when I come to court this better be the last time.*
> *I'm not kidding at all, I'm making this video public.*

*'Cause if I have to kill a judge or a lawyer or a woman I don't care.*
'Cause this is my daughter we're talking about.
I'm getting tired of abuse and the parent alienation.
You know it's abuse.

I love you; daughters are the beautiful things in my life.
It keeps me going and keeps me alive everyday.
*Take my child and I'll take your life.*

*I'm not kidding, judge, you better listen to me.*
*I killed a man downrange in war.*
*I have nothing against you, but I'm tellin' you this better be the last court date.*
Because I'm gettin' tired of missin' out on my daughter's love.
(And that's the name of the song by the way "Daughter's Love.")

And I'm getting tired of you sickos
Thinking it's the right thing for the children.
You think it's the best interest of the child,
But look at my daughter from her mother's abuse.
She's mentally and physically abused her,
And I'm getting tired of this bull.

*So I promise you, judge, I will kill a man.*
This time better be the last time I end up in court
'Cause, damn, this world is getting tired.
When you don't have your daughter to love on or have a big hug
'Cause she's so mentally abused and psychologically gone.
She can't even hold her own dad
Because her mom has abused [her] by parent alienation [ ].

And this s___ needs to stop because you're gonna lose your job.
*And I guarantee you, if you don't stop, I'll kill you.*
'Cause I am gonna make a point either way you look at it somebody's gotta pay,
And I'm telling you right now live on the Internet.
So put me in jail and make a big scene.
Everybody else needs to know the truth.

'Cause this s___'s been going on for 13 years and now my daughter's screwed up
'Cause the judge and the lawyers need money.
They don't really care about the best interest of the child.

*So I'm gonna f\_\_\_ somebody up, and I'm going back to war in my head.*
*So July the 14th is the last time I'm goin' to court.*

*Believe that.  Believe that, or I'll come after you after court.  Believe that.*

I love my daughter.
Nobody's going take her away from me.
'Cause I got four years left to make her into an adult.
I got four years left until she's eighteen.
So stop this s\_\_\_ because I'm getting tired of you,
And I don't care if everybody sees this Internet site
Because it is the truth and it's war.
Stop abusing the children and let 'em see their dads,
'Cause I love you, Allison.

I really do love you.  I want to hold you and hug you, and I want the abuse to stop.
That's why I started Traumatized Foundation.org. Traumatized Foundation.org.

Because of children being left behind, being abused by judges, the courts.
They're being abused by lawyers.
The best interest ain't of the child anymore.
The judges and the lawyers are abusing 'em.

Let's get them out of office.  Vote 'em out of office.
If fathers don't have rights or women don't have their rights or equal visitation,
Get their ass out of office.
*'Cause you don't deserve to be a judge and you don't deserve to live.*
*You don't deserve to live in my book.*
*And you're gonna get some crazy guy like me after your ass.*
*And I hope I encourage other dads to go out there and put bombs in their goddamn cars.*
*Blow 'em up.*  Because it's children we're, children we're talkin' about.

I care about her.
And I'm willing to go to prison,
But somebody's gonna listen to me,
Because this is a new war.

This ain't Iraq or Afghanistan.  This is goddamn America.  This is my
goddamn daughter.  There, I cussed.  Don't tell me I can't f\_\_\_in' cuss.

Stupid f___in' [Guitar crashes over in the background] *BOOM!*
*There went your f___in' car.  I can shoot you. I can kill you. I can*
*f___ you.  Be my friend.  Do something right.  Serve my daughter.*

Yeah, look at that, that's the evil.  You better keep me on God's side.
*Do the right thing July 14th.*

R.103-7 (emphases added).

Jeffries posted a link to the video on his Facebook wall and sent links to twenty-nine Facebook users, including Tennessee State Representative Stacey Campfield, WBIR Channel 10 in Knoxville, and DADS of Tennessee, Inc., an organization devoted to empowering divorced fathers as equal partners in parenting.  Twenty-five hours later, Jeffries removed the video from YouTube and his Facebook page.  That was too late.  By then, the sister of Jeffries' ex-wife had seen the link on Jeffries' wall and told the judge about it.

Law enforcement got wind of the video, and the italicized words caught their attention.  Federal prosecutors charged Jeffries with violating a federal law that prohibits "transmit[ting] in interstate or foreign commerce any communication containing any threat to . . . injure the person of another"—namely Chancellor Moyers.  18 U.S.C. § 875(c).  A jury convicted Jeffries.

*Elements of § 875(c).*  The heart of Jeffries' appeal turns on a jury instruction, which turns on the proper elements of a § 875(c) charge.  The parties agree that Jeffries could be convicted only if his threat was objectively real, only if a reasonable person would have perceived Jeffries' words and conduct as a true threat to Chancellor Moyers.  The question is whether the court, as Jeffries claims, also should have instructed the jury that it could convict Jeffries only if he subjectively meant to threaten the judge.

Here is what the court instructed the jury to do:

In evaluating whether a statement is a true threat, you should consider whether in light of the context a reasonable person would believe that the statement was made as a serious expression of intent to inflict bodily

injury on Chancellor Moyers and whether the communication was done to effect some change or achieve some goal through intimidation.

\*    \*    \*

The communication must be viewed from an objective or reasonable person perspective. Accordingly, any statements about how Chancellor Moyers perceived or felt about the communication are irrelevant. In fact, it is not relevant that Chancellor Moyers even viewed the communication. The defendant's subjective intent in making the communication is also irrelevant. Unlike most criminal statutes, the government does not have to prove defendant's subjective intent. Specifically, the government does not have to prove that defendant subjectively intended for Chancellor Moyers to understand the communication as a threat, nor does the government have to prove that the defendant intended to carry out the threat.

R.121 at 259–61.

Here is what Jeffries asked the court to say in the jury instructions:

In determining whether a communication constitutes a "true threat," you must determine the defendant's subjective purpose in making the communication. If the defendant did not seriously intend to inflict bodily harm, or did not make the communication with the subjective intent to effect some change or achieve some goal through intimidation, then it is not a "true threat."

R.87 at 6.

Based on existing precedent, the court correctly rejected Jeffries' proposed instruction. The language of the statute prohibits "any" interstate "communication" that "contain[s] any threat to . . . injure the person of another." 18 U.S.C. § 875(c). In proscribing interstate "communication[s]" of this sort, § 875(c) punishes speech. That is something courts must keep "in mind" in construing the statute, *Watts v. United States*, 394 U.S. 705, 707 (1969) (per curiam), but it is not something that insulates Jeffries' words from criminalization. Words often are the sole means of committing crime—think bribery, perjury, blackmail, fraud. Yet the First Amendment does not disable governments from punishing these language-based crimes, *United States v. Varani*, 435 F.2d 758, 762 (6th Cir. 1970), many of which pre-dated the First Amendment.

All that the First Amendment requires in the context of a § 875(c) prosecution is that the threat be real—a "true threat." *Watts*, 394 at 708. Once that has been shown, once the government shows that a reasonable person would perceive the threat as real, any concern about the risk of unduly chilling protected speech has been answered. For if an individual makes a true threat to another, the government has the right, if not the duty, to "protect[] individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur," all of which places the menacing words and symbols "outside the First Amendment." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992); *cf. Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942); *see also United States v. White*, 670 F.3d 498, 507 (4th Cir. 2012).

A § 875(c) prosecution, then, generally requires the government to establish that the defendant (1) made a knowing communication in interstate commerce that (2) a reasonable observer would construe as a true threat to another. Once the government makes this showing, we have held, it matters not what the defendant meant by the communication, as opposed to how a reasonable observer would construe it. In *United States v. DeAndino*, we held that § 875(c) is a general-intent crime that does not require proof of "a specific intent to threaten based on the defendant's subjective purpose." 958 F.2d 146, 149 (6th Cir. 1992). At issue there was an indictment charging a defendant with "willfully transmitt[ing] a communication containing a threat" to "blow [the victim's] brains out." *Id.* at 147. The district court dismissed the indictment on the ground that a defendant could be convicted only if she "willfully threatened or intended to threaten." *Id.* We reversed, explaining that nothing in the statutory text indicated "a heightened mental element such as specific intent." *Id.* at 148.

*United States v. Alkhabaz*, 104 F.3d 1492 (6th Cir. 1997), is of a piece. At issue was an indictment charging Alkhabaz with sending a co-conspirator emails "express[ing] a sexual interest in violence against women and girls." *Id.* at 1493. We upheld a dismissal of the indictment, concluding that to come within § 875(c) a threat must be communicated with intent (defined objectively) to intimidate. *Id.* at 1493, 1495. There, too, we re-affirmed that the statute does "not express[] a subjective standard." *Id.* at

1496.  To convict under § 875(c), a jury need conclude only that "a reasonable person (1) would take the statement as a serious expression of an intention to inflict bodily harm (the mens rea), and (2) would perceive such expression as being communicated to effect some change or achieve some goal through intimidation (the actus reus)." *Id.* at 1495. In each case, the defendant's subjective intent had nothing to do with it.

We do not stand alone.  Several circuits have expressly rejected an additional subjective requirement in construing this and related threat prohibitions.  *United States v. Whiffen*, 121 F.3d 18, 21 (1st Cir. 1997); *United States v. Francis*, 164 F.3d 120, 123 (2nd Cir. 1999); *United States v. Himelwright*, 42 F.3d 777, 782 (3d Cir. 1994); *United States v. Darby*, 37 F.3d 1059, 1067 (4th Cir. 1994); *United States v. Myers*, 104 F.3d 76, 80–81 (5th Cir. 1997); *United States v. Schneider*, 910 F.2d 1569, 1570 (7th Cir. 1990).  All of the others, with one exception (more on that later), have effectively reached the same conclusion by laying out a test that asks only whether a reasonable observer would perceive the threat as real.  *See United States v. Mabie*, 663 F.3d 322, 332 (8th Cir. 2011); *United States v. Welch*, 745 F.2d 614, 619 (10th Cir. 1984); *United States v. Callahan*, 702 F.2d 964, 965 (11th Cir. 1983) (per curiam); *Metz v. Dep't of Treasury*, 780 F.2d 1001, 1002 (Fed. Cir. 1986).  *But see United States v. Twine*, 853 F.2d 676, 681 (9th Cir. 1988) (holding that conviction under § 875 "require[s] a showing of a subjective, specific intent to threaten").

That would be the end of it but for one thing:  *Virginia v. Black*, 538 U.S. 343 (2003).  As Jeffries reads the decision, it invalidates all communicative-threat laws under the First Amendment unless they contain a subjective-threat element.  The argument is not frivolous, as one court (the Ninth) has accepted it.  But the position reads too much into *Black*.

At issue in *Black* was a state-law prohibition on cross burning, which forbade cross burning with "an intent to intimidate a person or group of persons." *Id.* at 347.  Of critical import, the statute "treat[ed] any cross burning as prima facie evidence of intent to intimidate." *Id.* at 347–48.  The Court upheld the statute's prohibition on cross burning but struck down the prima facie evidence provision as overbroad because "a

burning cross is not always intended to intimidate." *Id.* at 365.  A cross burning used in a movie or at a political rally, the Court explained, would be protected speech and could not be used as prima facie evidence of criminal intimidation.  *Id.* at 366.

*Black* does not work the sea change that Jeffries proposes.  The case merely applies—it does not innovate—the principle that "[w]hat is a threat must be distinguished from what is constitutionally protected speech." *Watts*, 394 U.S. at 707.  It says nothing about imposing a subjective standard on other threat-prohibiting statutes, and indeed had no occasion to do so: the Virginia law itself required subjective "intent." The problem in *Black* thus did not turn on subjective versus objective standards for construing threats.  It turned on overbreadth—that the statute lacked any standard at all. The prima facie evidence provision failed to distinguish true threats from constitutionally protected speech because it "ignore[d] all of the contextual factors that are necessary to decide whether a particular cross burning is intended to intimidate," and allowed convictions "based solely on the fact of cross burning itself." *Id.* at 365, 367.

No such problem exists here.  The reasonable-person standard winnows out protected speech because, instead of ignoring context, it forces jurors  to examine the circumstances in which a statement is made:  A juror cannot permissibly ignore contextual cues in deciding whether a "reasonable person" would perceive the charged conduct "as a serious expression of an intention to inflict bodily harm." *Alkhabaz*, 104 F.3d at 1495.  Unlike Virginia's cross-burning statute, which did "not distinguish between a cross burning at a public rally or a cross burning on a neighbor's lawn," *Black*, 538 U.S. at 366, the reasonable-person standard accounts for such distinctions.  A reasonable listener understands that a gangster growling "I'd like to sew your mouth shut" to a recalcitrant debtor carries a different connotation from the impression left when a candidate uses those same words during a political debate.  And a reasonable listener knows that the words "I'll tear your head off" mean something different when uttered by a professional football player from when uttered by a serial killer.

The objective standard also complements the explanation for excluding threats of violence from First Amendment protection in the first place.  Much like their cousins

libel, obscenity, and fighting words, true threats "by their very utterance inflict injury" on the recipient. *Chaplinsky*, 315 U.S. at 572. While the First Amendment generally permits individuals to say what they wish, it allows government to "protect[] individuals" from the effects of some words—"from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur." *R.A.V.*, 505 U.S. at 377, 388; *Black*, 538 U.S. at 344. What is excluded from First Amendment protection—threats rooted in their effect on the listener—works well with a test that focuses not on the intent of the speaker but on the effect on a reasonable listener of the speech.

Jeffries maintains that two statements in *Black* nonetheless demand a subjective inquiry as well: "'True threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence," *Black*, 538 U.S. at 359; and intimidation "is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death," *id.* at 360. The first statement shows only that a defendant "means to communicate" when she knowingly says the words. *See White*, 670 F.3d at 509 (concluding that "means to communicate" in *Black* refers to the act of communicating, not the intent to threaten); *see also United States v. Kimes*, 246 F.3d 800, 806–07 (6th Cir. 2001) ( "[A] general intent crime requires the knowing commission of an act that the law makes a crime."). The second statement shows that intimidation is *one* "type of true threat," a reality that does little to inform § 875(c), which prohibits *all* types of threats to injure a person.

Most of the other appellate courts to consider the issue have agreed that *Black* by itself does not provide a basis for overruling the objective standard. *See White*, 670 F.3d at 508–11 (4th Cir. 2012); *Mabie*, 663 F.3d at 332 (8th Cir. 2011); *United States v. Wolff*, 370 F. App'x 888, 892 (10th Cir. 2010) (asking only "whether a reasonable person would find that a threat existed"). One circuit declined to resolve the issue but said in dicta "that an entirely objective definition is no longer tenable." *United States v. Parr*, 545 F.3d 491, 500 (7th Cir. 2008). The other, largely consistent with its prior

precedents, holds that *Black*'s "means to communicate" language adds a subjective gloss that "must be read into all threat statutes that criminalize pure speech." *United States v. Bagdasarian*, 652 F.3d 1113, 1117 (9th Cir. 2011). Whether *Bagdasarian* represents the best original reading of the statute is one thing; but the idea that *Black*, a case about a statute that makes cross burning prima facie evidence of intent to intimidate, requires a change to a circuit's precedent concerning threats is another. As we see it, *Black* cannot be read so broadly, requiring us to stand by our decisions in *DeAndino* and *Alkhabaz*.

*Sufficiency of the evidence.* Jeffries separately argues that, even if the trial court correctly instructed the jury, there was insufficient evidence to convict him. The question is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The government met this modest standard.

The key evidence is the video. In it, Jeffries repeatedly says he will kill Chancellor Moyers if things do not go his way in the upcoming custody/visitation hearing. The threats are many, and a jury reasonably could take them as real:

"When I come to court this better be the last time";

"Take my child and I'll take your life";

"I killed a man downrange in war. I have nothing against you, but I'm tellin' you this better be the last court date";

"So I promise you, judge, I will kill a man";

"And I guarantee you, if you don't stop, I'll kill you";

"So I'm gonna f___ somebody up, and I'm going back to war in my head. So July the 14th is the last time I'm goin' to court. Believe that. Believe that, or I'll come after you after court";

"Cause you don't deserve to be a judge and you don't deserve to live. You don't deserve to live in my book";

"And I hope I encourage other dads to go out there and put bombs in their goddamn cars.  Blow 'em up";

"There went your f___in' car.  I can shoot you.  I can kill you."

R.103-7.

The threats had an objective:  getting the judge to "do the right thing July 14th." *Id.*  And through all of the threats, his words (I am "not kidding") and his appearance (plenty of glares and no hints of a smile) left the distinct impression that the threats were real.  He urged others to bomb judges' cars, and claimed he was willing to go to prison if necessary.  Nor was he shy about his distribution of the video.  He posted the video publicly, sent it to a television station and state representative, and urged others to "take it to the judge."  R.103-5.  On this record, a rational juror could conclude that a reasonable person would take the video as "a serious expression of an intention to inflict bodily harm . . . communicated to effect some change or achieve some goal." *Alkhabaz*, 104 F.3d at 1495.

No doubt, it is unusual or at least a sign of the times that the vehicle for this threat was a music video.  Best we can tell, this is the first reported case of a successful § 875(c) prosecution arising from a song or video.  One answer to the point is that the statute covers "any threat," making no distinction between threats delivered orally (in person,  by phone) or in writing (letters, emails, faxes), by video or by song, in old-fashioned ways or in the most up-to-date.  Nor would this be the first time that an old flask was filled with new wine—that an old statute was applied to a technology nowhere to be seen when the law was enacted. *See OfficeMax*, *Inc. v. United States*, 428 F.3d 583, 586 (6th Cir. 2005).  Another answer to the point is that the method of delivering a threat illuminates context, and a song, a poem, a comedy routine or a music video is the kind of context that may undermine the notion that the threat was real.  But one cannot duck § 875(c) merely by delivering the threat in verse or by dressing it up with political (and protected) attacks on the legal system.  Sure, "one man's vulgarity is another's lyric," *Cohen v. California*, 403 U.S. 15, 25 (1971), but we leave behind "matters of taste and style," *id*., when an individual makes a real threat to harm another.

Had Bob Dylan ended "Hurricane" with a threat to kill the judge who oversaw Rubin Carter's trial, the song's other lyrics or the music that accompanied them would not by themselves have precluded a prosecution. In the same way, Jeffries cannot insulate his menacing speech from proscription by conveying it in a music video or for that matter by performing the song with a United States flag burning in the background. *See Texas v. Johnson*, 491 U.S. 397 (1989).

*Facebook messages.* Jeffries argues that a dozen Facebook messages shown to the jury were irrelevant. Jeffries' twenty-eight posts on Facebook contained not just links to his YouTube video but also short messages to the recipients. Most of them encouraged his friends to show the video to Chancellor Moyers. Examples include: "Give this to Danny and the Judge"; "Give this to the Judge for court"; and "Tell the judge." R.103-5. A few messages sounded a different tune: "Comedy for the courts," and "Here is my public voice for the Judges in Knoxville Tennessee." *Id.* While many of these messages were shown to the jury, none of them was covered by the indictment, which charged Jeffries with transmitting "a video of himself posted on the public internet websites YouTube and Facebook." R.33.

The Facebook messages were relevant because they gave context to the video. Whether a reasonable person would take the video "as a serious expression of an intention to inflict bodily harm" depends on its setting. The messages became part of that backdrop when Jeffries included them together with the YouTube link in a single communication. Because *Alkhabaz* required the prosecution to prove that a reasonable person "would perceive such expression as being communicated to effect some change or achieve some goal through intimidation," 104 F.3d at 1495, moreover, the messages were relevant to that feature of the crime. At a minimum, the messages tend to show that a reasonable receiver would perceive the video as intended to reach the judge and influence his decision in Jeffries' upcoming hearing.

Jeffries persists that the only relevant messages were those that reached or could have reached Chancellor Moyers or Amanda Long (the woman who viewed the video and brought it to Moyers' attention). Br. 45. As Jeffries sees it, Chancellor Moyers was

the recipient of the video, and only his perspective matters. *See Alkhabaz*, 104 F.3d at 1496. But § 875(c) does not require a threat to be communicated to its target. It prohibits a "communication containing any threat" regardless of whether the threat reaches the target. *See id.* at 1495–96. Each of Jeffries' Facebook links represents a communication. Although Chancellor Moyers was the only target of Jeffries' threat, he was not the only receiver of the communication: All of the Facebook friends to whom Jeffries sent the video were recipients. The messages accompanying each link were available to these recipients, and they provide relevant context for determining whether, objectively speaking, a recipient would perceive the video as a threat. The district court did not abuse its discretion by allowing the jury to consider all of the messages as part of all of the contexts in which Jeffries made these communications. *See* Fed. R. Evid. 403.

*Other YouTube videos.* Jeffries adds that the district court should have allowed him to show the jury other videos he posted on Facebook. Br. 49. But he posted the other videos weeks prior to the one at issue, and their content was unrelated to the hearing with Chancellor Moyers, eliminating the possibility of error, abuse of discretion or otherwise, in excluding them.

The key video was captioned "Coors Beer Sucks." Although these clips might have entertained the jury and illustrated Jeffries' "sometimes peculiar sense of humor," Br. 50, they were not part of the targeted communication's context for purposes of determining whether a recipient of the Chancellor Moyers video would perceive it as a threat. The court thus properly excluded this video and several others—"Fastest Pin in Wrestling History," "PT Belt Part One," "Funniest Video on YouTube (The Big Chair)," "Auditions for Fathers," R.99-2—as irrelevant. *See* Fed. R. Evid. 402.

*Venue.* Jeffries claims venue was not proper in the Eastern District of Tennessee because he recorded and uploaded the video in the Western District. But Jeffries transmitted his video "from, through, or into" the Eastern District, just as the venue statute demands. 18 U.S.C. § 3237(a). Through at least two Facebook links, he

transmitted the video to recipients in the Eastern District:  Jeffries' sister and the news station WBIR Channel 10.

For these reasons, we affirm.

---------------------

**DUBITANTE**

---------------------

SUTTON, Circuit Judge, dubitante.  Sixth Circuit precedent compels this interpretation of § 875(c), one that requires the government to prove only that a reasonable observer would construe the communicated words as a threat, not that the defendant meant the words to be a threat as well.  The First Amendment, as construed by *Virginia v. Black*, 538 U.S. 343 (2003), does not require a different interpretation. I write separately because I wonder whether our initial decisions in this area (and those of other courts) have read the statute the right way from the outset.

The statute prohibits "transmit[ting] in interstate or foreign commerce any communication containing any threat to . . . injure the person of another."  18 U.S.C. § 875(c).  The key phrase is "threat . . . to injure the person of another."  The key word is "threat."

Every relevant definition of the noun "threat" or the verb "threaten," whether in existence when Congress passed the law (1932) or today, includes an intent component. "[T]o declare (usually conditionally) one's intention of inflicting injury upon" a person, says one dictionary.  11 Oxford English Dictionary 352 (1st ed. 1933).  "[A]n expression of an intention to inflict loss or harm on another by illegal means, esp. when effecting coercion or duress of the person threatened," says another.  Webster's New Int'l Dictionary 2633 (2d ed. 1955).  "A communicated intent to inflict harm or loss on another," says still another.  Black's Law Dictionary 1489 (7th ed. 1999).  And so on: "An expression of an intention to inflict pain, injury, evil, or punishment."  American Heritage Dictionary of the English Language 1801 (4th ed. 2000).  And on:  "An expression of intention to inflict something harmful."  Webster's New College Dictionary 1149 (1995).  And on:  "[A] declaration of an intention or determination to inflict punishment, injury, etc., in retaliation for, or conditionally upon, some action or course."  Random House Unabridged Dictionary 1975 (2d ed. 1987).

Conspicuously missing from *any* of these dictionaries is an objective definition of a communicated "threat," one that asks *only* how a reasonable observer would perceive the words. If words matter, I am hard pressed to understand why these definitions do not resolve today's case. The definitions, all of them, show that subjective intent is part and parcel of the meaning of a communicated "threat" to injure another.

The history of § 875 reinforces this conclusion. The law made its first appearance in 1932, starting out only as a prohibition on extortion. It encompassed threats coupled with an intent to extort something valuable from the target of the threat. Pub. L. No. 72-274 (1932) (prohibiting a "threat" communicated "with intent to extort . . . money or other thing of value"). From the beginning, the communicated "threat" thus had a subjective component to it. Nothing changed when Congress added a new "threat" prohibition through § 875(c) in 1939. The question was whether the legislature should prohibit nonextortive threats, not whether the statute should cover words that might be perceived as threatening but which the speaker never intended to create that perception. *See* Pub. L. No. 76-76 (1939). In debates about the bill, the notion of intention-free threats never came up; what dominated the discussion was the distinction between threats made for the purpose of extorting money and threats borne of other (intentional) purposes: "animosity," "spite" or "revenge." *Threatening Communications: Hearing Before the Comm. on the Post Office and Post Roads*, 76th Cong. 7, 9 (1939) (statement of William W. Barron, Dept. of Justice). In prohibiting non-extortive threats through the addition of § 875(c), Congress offered no hint that it meant to write subjective conceptions of intent out of the statute.

Background norms for construing criminal statutes point in the same direction. Courts presume that intent is the required mens rea in criminal laws, *Morissette v. United States*, 342 U.S. 246, 250 (1952), a presumption that applies at a minimum to the "crucial element separating legal innocence from wrongful conduct," *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 73 (1994). The crucial element of § 875(c)—what divides innocence from crime—is a threat. It is not enough that a defendant knowingly communicates *something* in interstate commerce; he must communicate a threat, a word

that comes with a state-of-mind component. Allowing prosecutors to convict without proof of intent reduces culpability on the all-important element of the crime to negligence. That after all is what an objective test does: It asks only whether a reasonable listener would understand the communication as an expression of intent to injure, permitting a conviction not because the defendant intended his words to constitute a threat to injure another but because he should have known others would see it that way. The reasonable man rarely takes the stage in criminal law. Yet, when he does, the appearance springs not from some judicially manufactured *deus ex machina* but from an express congressional directive. *Id*; *see U.S.S.G. § 2 B3.1* cmt. n.6 (defining "threat of death" only as "conduct that would instill in a reasonable person . . . a fear of death"). No such directive exists here. To the contrary: In enacting § 875(c), Congress just used the word "threat," indicating that one cannot make a prohibited menacing communication without meaning to do so.

What, then, explains all of this contrary authority? I am not sure. None of the cases addressing this issue cites, much less quotes, any dictionary definitions of "threat." Nor do any of them mention the history of the statute, its roots in extortion or its purpose. To the extent the cases mention the presumption in favor of a mens rea for a criminal statute, they say only that this customary feature of criminal laws is answered by the requirement that the threat be knowingly communicated, not that it be subjectively threatening, even though the threat is the defining feature of the crime.

Instead of heeding these conventional indicators of meaning, some of the cases, including our own, have framed the inquiry as one of general versus specific intent, equating general intent with an objective definition of "threat." "If the statute contains a general intent requirement," we have said, "the standard used to determine whether or not the communication contained an actual threat is an objective standard . . . . If the statute contains a specific intent requirement, the standard is a subjective standard." *DeAndino*, 958 F.2d at 148. I am not sure where *DeAndino* found the rule that general intent is synonymous with an objective definition of threat. However useful this concept

may be in deciphering laws in other areas, perhaps even in criminal cases from time to time, the distinction does not entitle courts to alter the meaning of "threat."

Other cases, many of the recent ones, have looked at this issue through the prism of free-speech principles and the *Black* decision. But the bright lights of the First Amendment may have done more to distract than inform. Ever since the *Watts* decision in 1969, it has been clear as a matter of constitutional avoidance that threat prohibitions like this one cover only "real" threats, threats in other words that a reasonable observer would take as true and real. *Watts v. United States*, 394 U.S. 705, 708 (1969) (per curiam). That is all well and good, as it makes sense to interpose this objective requirement on the criminalization of speech. But that consideration offers no basis for alchemizing the normal meaning of threat into an objective-intent question *alone*. What should happen instead is this: The statute should require first what the words say (a subjectively intended threat) and second what constitutional avoidance principles demand (an objectively real threat).

Nor is it the least bit unusual to adopt a legal standard that contains objective and subjective components. *See, e.g.*, *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (laying out objective and subjective components of an Eighth Amendment prison claim); *Hadjimehdigholi v. I.N.S.*, 49 F.3d 642, 646 (10th Cir. 1995) ("The well-founded fear of persecution standard [for refugee status] is comprised of both a subjective and an objective component."); *United States v. Spinelli*, 848 F.2d 26, 28 (2d Cir. 1988) ("[T]he proper standard for determining whether exigent circumstances warranted noncompliance with the knock-and-announce statute comprises both subjective and objective components."); *Vikase Companies, Inc. v. World PAC Inter'l AG*, 710 F. Supp. 2d 754, 756 (N.D. Ill. 2010) ("The test for bad faith comprises both objective and subjective components.").

When some law-making bodies "get into grooves," Judge Learned Hand used to say, "God save" the poor soul tasked with "get[ting] them out." Hand, *The Spirit of Liberty* 241–42 (2d ed. 1954). That may be Franklin Delano Jeffries' fate—and ours. The Department of Justice, defense lawyers and future courts may wish to confirm that

the current, nearly uniform standard for applying § 875(c) is the correct one.  I am inclined to think it is not.