NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0453n.06

No. 19-3591

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| | ) | Aug 03, 2020 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| MICHAEL A. HAGAR, | ) | NORTHERN DISTRICT OF |
| | ) | OHIO |
| Defendant-Appellant. | ) | |
| | ) | |

BEFORE:     SUHRHEINRICH, GIBBONS, and BUSH, Circuit Judges.

SUHRHEINRICH, Circuit Judge.  After being fired by Goodyear and Eaton corporations, Defendant Michael A. Hagar used the internet to harass and threaten employees of both companies, as well as Oregon law enforcement officials.  He was tried and convicted on charges of cyberstalking and making interstate threats.  He raises various challenges to his conviction and sentence in this appeal.  We affirm the district court in all respects.

**I. BACKGROUND**

**A.  Facts**

In the fall of 2013 Goodyear fired Hagar for inappropriately accessing personnel information with a Goodyear computer and then using it against his co-workers.  In November 2015, Eaton fired Hagar because of Hagar's anger management issues.  Hagar worked at Oregon sites for both companies.

Hagar's tirades began shortly after his firing from Eaton. Hagar sent J.R., his manager at Eaton, voice messages and emails stating "how he was going to basically make [J.R.] pay and how he was going to ruin [J.R.'s] life."

Hagar asked other Eaton employees to confirm J.R.'s address. The address he possessed was "almost identical" to J.R.'s actual address. Hagar's threats impelled J.R. to buy a firearm and install a home security system. Eaton posted a guard at J.R.'s house.

Hagar followed the same playbook with Goodyear. In 2015 (a year and one-half after his firing from Goodyear), Hagar sent a threatening email to R.D., his manager at Goodyear. Again, Hagar emailed coworkers to confirm R.D.'s address, which Hagar had correct. R.D. bought a gun. Goodyear placed a security guard at R.D.'s house, and at two Goodyear facilities in Oregon. The company also hired a private security firm to surveil Hagar. Hagar referenced these "guards" in one of his emails to R.D. and others.

R.G., a female engineer at Eaton, was the principal object of Hagar's ardor. About a month after Eaton fired Hagar, he sent R.G. the following message through Facebook: "We only really talked once, at the door leading to the break room. We do not know one another." In another Facebook message, he told R.G. that, "as you know I am attracted to you." In still another, he said, "Your mother is Facebook friends with [C.B.]," who is "Vice President Corporate Systems Worldwide at Eaton." In total, Hagar sent to R.G. 31 pages of Facebook messages between February and May 2016. Hagar's feelings went unrequited; R.G. did not respond to any of Hagar's missives.

Hagar's enchantment quickly turned to anger. On April 24, 2016, he wrote R.G. that:

I GOING TO RUIN YOUR LIFE LIKE YOU TRIED TO RUIN MINE [repeated twice]

ENJOY YOUR LIFE IN PRISON

Hagar also sent emails to R.G.'s work and personal accounts. On April 24, he sent the following email to R.G. and other Eaton employees:

I AM GOING TO CREATE APPREHENSION IN EVERY MOMENT OF YOUR LIVES.

On May 5, 2016, R.G. obtained a "temporary stalking protective order" against Hagar in Oregon state court, which forbid all contact with R.G. The Oregon police personally served the order on Hagar on May 9. In that order, Hagar was directed to appear on June 3 for a hearing to extend the order indefinitely. Hagar admitted that he had been served with the order. Hagar failed to appear in court, however.

Between April 24 and April 30, Hagar sent R.G. and other Eaton employees a series of increasingly threatening emails. On May 30, 2016, Hagar emailed R.G., other Eaton employees, and R.D. at Goodyear, targeting their "sanity" (the "Sanity email"). He added the Oregon police to his hit list:

I AM GOING TO MAKE CERTAIN EVERYONE OF YOU SUFFER THE MENTAL ABUSE I HAVE FOR THE PAST YEAR! AS ALL OF YOU A[RE] LITTLE PUSSIES, I IMAGINE IT WILL ONLY TAKE A SHORT PERIOD OF TIME UNTIL YOU REALIZE THAT I AM MASTER OVER YOUR PATHETIC LIVES NOW.

ENJOY WHAT LITTLE TIME YOU HAVE LEFT OF YOU[R] SANITY.

Oregon law enforcement officials became additional recipients of Hagar's vitriol after he was arrested on March 11, 2016 for trespassing when he appeared at one of Goodyear's Oregon sites. M.M., the state prosecutor assigned to Hagar's trespass case, received over 50 emails from Hagar. Hagar also visited Eaton after he was fired. On one occasion, he was seen driving through the Wilsonville facility parking lot and on another he was seen standing across the street.

Hagar also "reached out" to C.B., a Vice President at Eaton headquarters in Beachwood, Ohio, and R.G.'s step-aunt. In May 2016, he sent four deranged and threatening Facebook

messages to C.B.'s work account at Eaton headquarters in Beachwood, Ohio. In one message, Hagar indicated that he could "go to Ohio."

On the eve of the scheduled stalking order hearing, Hagar's emails sent to R.G., C.G., J.R., and others reached a violent crescendo:

> I AM GOING TO SHOOT ONE OF MY GUARDS SOON . . . AND THEN I WILL MAKE CERTAIN ALL OF YOU ARE SHOT ALSO.

I ONLY HAVE TO S[H]OOT YOUR KNEE CAP . . . AND YOU WILL NEVER WALK AGAIN[.]

And, on June 3, Hagar sent an email to R.G. and C.B. exclusively, threatening to go to "COLUMBIA MARYLAND" (where R.G.'s parents lived) "AND TELL YOU[R] FAMILY PERSONALLY WHAT YOU ARE RESPONSIBLE FOR."

Oregon police searched Hagar's residence following the "SHOOT" threats. There they found four handguns, two rifles (an AR-15 and an AK-47), thousands of rounds of ammunition, two U.S. Army field training manuals discussing attack tactics,[1] extended magazines, two shoulder holsters, a backpack, and handwritten notes on Eaton personnel, including on C.B. and R.G., as well as the names of R.G.'s mother, father, and sister. Hagar's personal notes on C.B. and R.G. included "location information."

### B. Detention and Charges

On June 16, 2016, the United States petitioned the district court for a writ of *habeas corpus ad prosequendum* to bring Hagar to the Northern District of Ohio from Oregon. At that time, he was in jail for charges related to his violation of the protective order. The magistrate judge issued an arrest warrant on June 14, 2016, and the writ on June 17, 2016. Hagar's initial appearance date

---

[1] For example, one of the bookmarked passages read in pertinent part: "The tactician cannot ignore the human aspect. He seeks to recognize and exploit indicators of fear and weakness in his enemy, and to defeat the enemy's will, since soldiers remain key to generating combat power."

was set for July 7, 2016, which was continued to July 26 and then to August 2. The United States Marshals Service executed the writ on August 1, 2016 and Hagar appeared before the magistrate judge on August 2, 2016. On August 5, the magistrate judge ordered that Hagar be detained pending trial.

On August 24, 2016, Hagar was charged in a three-count indictment with cyberstalking in violation of a protective order, in violation of 18 U.S.C. §§ 2261A(2)(B) and 2261(b)(6) (Count 1); and two counts of making a threatening communication in interstate commerce, in violation of 18 U.S.C. § 875(c) (Counts 2 and 3). On September 11, 2018, the government filed a superseding indictment, which added additional details to the initial indictment, but retained the three charges.

## C. Pretrial Rulings

Between his initial August 24 indictment and his trial, which began in February 2019, Hagar signed six speedy trial waivers, moved to dismiss his trial counsel moved to continue trial three times and filed a motion i*n limine*.

## D. Trial

At trial, the government presented multiple witnesses. Detective Sergeant Lee Gosson of the Multnomah County Sheriff's Office testified that he interviewed Hagar on June 6, 2016, after Hagar waived his *Miranda* rights. During the interview, they discussed Hagar's intentions. Hagar admitted to sending the SHOOT emails and others because "he was pissed and wanted to be heard." Matthew Coberly, global security director for Eaton, testified that he monitored Hagar's emails from Eaton's headquarters in Beachwood, Ohio. He described the content of the emails as escalating from "insulting to harassment to threatening." Coberly also sent a cease and desist letter to Hagar in April 2016. Michael Peterson, director of global investigations at Goodyear at its headquarters in Akron, Ohio, testified that as a result of Hagar's conduct, Goodyear "placed

security on the retail stores and . . . personal security on [J.R.]." Goodyear also "captured" any emails sent to Goodyear from Hagar and "rerouted [them] to a box that was coming directly to [Peterson's] department." Other government witnesses included C.B., R.D., M.M., J.R., and R.G.

Hagar also testified. He admitted that he sent the threatening communications and that he owned the evidence found in his trailer. He also acknowledged receipt of the May 9 temporary protective order, and that he knew that he was prohibited from contacting R.G. and did so anyway. Hagar claimed he never had any intention of causing physical harm to the recipients of his emails. Regarding his threats to "shoot" people, Hagar explained that:

> Actually by that point in time I was completely frustrated and I felt that no one had wanted to listen to me whatsoever, and I just . . . wrote something out that . . . I almost felt like I had to shoot somebody for . . . people to listen to me.

Hagar moved for judgment of acquittal, arguing that "the e-mails and correspondence all occurred outside of the Northern District of Ohio. . . . So we would ask . . . this Honorable Court to dismiss the charges based on this Court's lack of jurisdiction to hear this case." He added, "[a]t most, this case should have been pursued in Oregon." The district court denied the motion. The jury convicted Hagar on all counts.

### E. Sentencing

Hagar's presentence sentencing report (PSR) started with a base offense level of 12 pursuant to USSG § 2A6.1. The PSR added six levels because "Hagar demonstrated an intention to carry out the threats"; added two levels because he made two or more threats; added two more levels for his threatening of R.G. following the issuance of the protective order; added four levels because Hagar substantially disrupted Goodyear's and Eaton's operations; and added six more levels for his threatening of Oregon law enforcement and county prosecutors. This gave Hagar a total offense level of 32. Hagar received a criminal history category of I because he had

no prior convictions.  The corresponding advisory Guidelines range was 121 to 151 months' imprisonment.

The PSR included victim impact statements from R.G, J.R., and Goodyear.  Both R.G. and J.R. worry that Hagar will continue to be a danger upon his release.  R.G. stated that "Hagar terrorized and tormented me, and others, for months with the sole purpose of taking any feeling of security away.  I continue to see the mental, physical, and emotional impact that he has had on me . . . ."  She also said that Hagar "changed my 'normal' life to one full of fear."  She stated that although therapy and self-defense classes have helped with her anxiety,

> I fear when he is released, he will continue to be a danger to myself and others.  His lack of remorse at the trial, and his inability to accept any guilt concerns me.  I realize that I might not be able to hide from him and that fear haunts me.  I also worry about my family.  He made it very clear that he knows how to find them.  I know that I will never fully heal from this but I hope that with more time and the comfort knowing that he is in custody, I may be able to find some peace.

Goodyear reported that Hagar caused it to spend over $406,000 in private security services.

Hagar claimed that the six-level increase for "intention to carry out the threats" was unwarranted because the evidence did not establish that he intended to carry out the threats.  Hagar objected to the two-level increase for committing the offense while subject to a protective order on the ground that the order was "not issued lawfully."  The district court overruled his objections.  Hagar asked for a 41-month sentence, with credit for time served since his incarceration in June 2016.  The government sought the 180-month statutory maximum.

The district court ultimately found:

> [T]his offense goes beyond the pale . . . .  There's been no physical injury, but the mental stress and mental injury to the victims is more than I've seen in my lifetime.  And if I have to reflect the seriousness of the offense in the sentence and deter criminal conduct, I think the maximum sentence is appropriate.  And the public has to be protected from what you did, and I just heard here again, I heard your testimony. . . .  And I don't see any remorse.  I don't see any acceptance of responsibility for acting badly and committing crimes.  Nothing. . . .  And so I don't

see any assurance that if you were on the street, that the public would be protected at all. In fact, I see just the exact opposite.

The court sentenced Hagar to 60 months on each count, to be served consecutively, for a total of 180 months. It ordered Hagar to pay $155,654 to Eaton and $403,832.41 to Goodyear.

This appeal follows.

## II. Analysis

### A. Speedy Trial Claims

Hagar argues that the district court erred when it failed to grant his motions to dismiss the indictment for Speedy Trial Act violations. He argues that the first motion should have been granted because he was arrested on July 7, 2016, but not indicted until August 24, 2016, in violation of the 30-day window of 18 U.S.C. § 3161(b). In his second motion to dismiss, Hagar claimed that seventy days passed from the date of his arraignment on the superseding indictment, September 19, 2018, and his trial, in violation of § 3161(c).

Speedy Trial Act claims "by their own terms must be raised pre-trial or be forever waived." *United States v. Pickett*, 941 F.2d 411, 416 (6th Cir. 1991); *United States v. Stewart*, 628 F.3d 246, 253 (6th Cir. 2010). This is not exactly Hagar's problem, because he brought his motions pretrial; the problem is that he failed to secure rulings on those motions from the district court. Similar claims are generally treated as abandoned and therefore not reviewable on appeal. *See, e.g., United States v. Harris*, 165 F.3d 1062, 1066 (6th Cir. 1999) (treating the appellant's failure to request a ruling on a discovery motion at trial or at the final pretrial conferences as abandonment of the claim on appeal); *see also United States v. Franklin*, 197 F.3d 266, 270 (7th Cir. 1999) (stating that a defendant faces waiver if he fails to renew a pretrial motion that the trial court has not ruled on). And with good reason: "motions appealed in this fashion . . . [may] encourage parties to cache unanswered motions and, by doing so, disrupt the efficient function of the judicial process."

*Franklin*, 197 F.3d at 270. Thus, "[i]f a motion is not acted upon, a litigant had better renew it. He may not lull the judge into thinking it has been abandoned and then, after he has lost, pull a rabbit out of his pocket in the form of the forgotten motion." *Id.* (quoting *United States v. Taglia*, 922 F.2d 413, 416 (7th Cir. 1991)).

We agree with the government that "failing to request and obtain rulings on such [raised-but-unruled-upon] claims is the functional equivalent of failing to bring the claims in the first place," and such claims are therefore waived.[2] Moreover, plain error review is unavailable because "a defendant whose trial does not begin on time is deemed to have waived the right to move for dismissal." *United States v. Brown*, 498 F.3d 523, 529–30 (6th Cir. 2007) (quoting *Zedner v. United States*, 547 U.S. 489, 494 (2006)).

Even if we ruled on Hagar's claims he would still lose. Hagar's first speedy trial claim is premised on the misunderstanding (based on a scrivener's error) that he was arrested by federal authorities on July 7, 2016.[3] But Hagar could not have been in federal custody on July 7. Hagar was arrested by Oregon state authorities in June 2016. He remained in state custody until his initial appearance in federal court on August 2, after the Marshals' Service executed the federal writ on August 1. On August 2, Hagar was merely in the temporary custody of the Northern District of Ohio, pursuant to the writ of *habeas corpus ad prosequendum*. *See United States v. Munro*, 436 U.S. 340, 362 (1978); *Stewart v. Bailey*, 7 F.3d 384, 389 (4th Cir. 1993). The Speedy Trial clock was still not triggered since "only federal arrest, as distinct from state arrest, triggers the protections of the Speedy Trial Act." *United States v. Copley*, 774 F.2d 728, 730 (6th Cir. 1985).

---

[2] In contrast, at the trial's outset, Hagar requested a ruling on his motion *in limine* to preclude firearms evidence.

[3] Perhaps this occurred because Hagar's initial appearance was originally scheduled for July 7, 2016. That did not happen, however.

In any event, Hagar was indicted 23 days later, on August 24, 2016, within 30 days. *See* 18 U.S.C. § 3161(b).

Hagar's second speedy trial act claim also falls flat. First, it is different from and contradictory to the argument he made before the district court. There, Hagar argued that his speedy trial waivers were based on his mistaken belief that the government had evidence of certain emails that created jurisdiction for the district court. On appeal, Hagar claims that the district court should have dismissed the superseding indictment under the Speedy Trial Act because he did not execute a speedy trial waiver when the superseding indictment was filed and more than 70 days elapsed between September 19, 2018 and February 26, 2019. We can therefore refuse to consider Hagar's argument. *See New Hampshire v. Maine*, 532 U.S. 742, 749–51 (2001). Second, Hagar forgets that he himself requested a continuance after the government filed the superseding indictment on September 11.

Even if we found a Speedy Trial Act violation, we would not dismiss the indictment with prejudice. Hagar's offenses were extremely serious. Hagar himself contributed to much of the delay in this case by filing numerous continuance motions and a request for new counsel. Hagar also has not shown actual prejudice from the delay such as loss of evidence, and there is not a whiff of prosecutorial bad faith. *See Sylvester v. United States*, 868 F.3d 503, 512 (6th Cir. 2017) (identifying the three factors this court considers when deciding to dismiss an action with or without prejudice). Thus, even assuming a Speedy Trial Act error, the government could re-indict Hagar.

## B. Venue Claim

On appeal Hagar contends that the Northern District of Ohio was an improper venue and that the district court "did not have jurisdiction to impose a criminal judgment against him"

because he did not send the emails to Ohio and did not know that they would be forwarded by individuals or automatically re-routed to the Eaton headquarters in Beachwood, Ohio, or the Goodyear Headquarters in Akron, Ohio. Hagar asserts that he should have been prosecuted in Oregon.

Hagar has a right to be tried in the state and district where he committed his crimes. *See* U.S. Const, art. III, § 2, cl. 3; U.S. Const, amend. VI; Fed. R. Crim. P. 18. But criminal offenses "begun in one district and completed in another," may be "inquired of and prosecuted in any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a); *see also United States v. Brika*, 416 F.3d 514, 527 (6th Cir. 2005) (applying a "substantial contacts" venue test).

Defects in venue generally must be asserted before trial. *United States v. Grenoble*, 413 F.3d 569, 573 (6th Cir. 2005). A court may not consider an untimely venue claim unless a defendant shows "good cause" for his untimeliness. Fed. R. Crim. P. 12(c)(3). However, if a venue defect is not apparent on the face of the indictment, a defendant may bring that challenge in a motion for acquittal at the close of the government's case. *See United States v. Ramer,* 883 F.3d 659, 682 (6th Cir. 2018)*; United States v. Lozoya*, 920 F.3d 1231, 1238 (9th Cir. 2019). If the venue challenge is properly preserved in the Rule 29 motion, we review the trial court's denial of that motion "in the light most favorable to the prosecution." *Grenoble*, 413 F.3d at 572.

Hagar did not bring a pre-trial change of venue motion, and he did not try to show "good cause" for that failure. He merely mentioned venue in his second speedy trial motion. He has therefore failed to preserve any facial challenge to venue. *Grenoble*, 413 F.3d at 573; Fed. R. Crim. P. 12(b)(3)(A)(i) and 12(c)(3).

In his Rule 29 motion for judgment of acquittal, Hagar argued that the district court did not have jurisdiction over this case because the emails and correspondence occurred outside of the Northern District of Ohio and suggested that the case could only be tried in Oregon. He did not argue for a judgment of acquittal on venue grounds. The two concepts are distinct. *See, e.g., United States v. Obak*, 884 F.3d 934, 936–37 (9th Cir. 2018). He therefore forfeited the venue argument. *See United States v. Dandy*, 998 F.2d 1344, 1356–57 (6th Cir. 1993) (holding that when a defendant raises specific arguments in a Rule 29 motion, he forfeits arguments not made).

And, even if he had not forfeited his venue claim,[4] it would fail because one of the victims, C.B., worked in Beachwood, Ohio at Eaton's headquarters. Hagar sent threatening emails to C.B.'s Eaton email address. She received and reviewed them at her office in Beachwood, Ohio.[5] Thus, venue was proper because the emails were sent from Oregon to C.B. in the Northern District of Ohio. *See United States v. Jeffries*, 692 F.3d 473, 483 (6th Cir. 2012), *abrogated on other grounds by Elonis v. United States*, 135 S. Ct. 2001 (2015) (holding that venue was proper in the Eastern District of Tennessee, where victims received threatening YouTube video via the internet sent from the Western District of Tennessee); *see also United States v. Singer*, 782 F.3d 270, 278 (6th Cir. 2015), *abrogated on other grounds by Musacchio v. United States*, 136 S. Ct. 709 (2016) (holding that in a mail fraud case venue is proper where the mail was sent or received).

Further, our "substantial contacts" test is also satisfied. *See Brika*, 416 F.3d at 527. "That test takes into account a number of factors—the site of the defendant's act, the elements and nature of the crime, the locus of the effect of the criminal conduct, and the suitability of each district for accurate fact finding." *Id.* (cleaned up). Eaton and Goodyear are both headquartered in the

---

[4] The government acknowledges that it is possible to view Hagar's "jurisdictional" challenge as raising venue.
[5] Additionally, Count 1 of the superseding indictment referenced those messages because R.G., the cyberstalking victim, was related to C.G.

Northern District of Ohio and dealt with the effect of Hagar's actions from their respective Ohio headquarters. Thus, the "locus of the effect" of Hagar's conduct was felt in both Oregon and the Northern District of Ohio. *See id.* Several of the witnesses and much of the evidence was also located in Ohio.

That Hagar did not know his messages were "re-routed" or forwarded to the Northern District of Ohio is irrelevant. *See United States v. Houston*, 683 F. App'x 434, 438 (6th Cir. 2017) (observing, in a case involving interstate threats, that the "route" the defendant's threats took after he pronounced them were relevant to determining where "he would be subject to prosecution," regardless of the defendant's knowledge that the communications would be routed across state lines). That C.B. did not see all of the messages because Eaton's security office shielded her from them also does not matter. *Cf. Jeffries*, 692 F.3d at 483 (holding that the interstate threats statute "prohibits a communication containing any threat regardless of whether the threat reaches the target") (cleaned up). In short, the government's evidence easily satisfied the preponderance of evidence standard that venue was proper in the Northern District of Ohio. *See Grenoble*, 413 F.3d at 572 (a district court's decision to deny a properly preserved venue motion is reviewed de novo, and the government must show by a preponderance of evidence that venue was proper).

### C. Firearms and Ammunition Evidence

During the hearing on Hagar's motion *in limine* concerning the firearm evidence obtained from his residence, the government explained that the evidence

> basically . . . goes to one of the intent elements of the stalking statute which requires the intent to kill, injure, harm, intimidate. It goes directly to that in preparation for the plan to carry that out to have that intent . . . . It also goes to establishing whether or not these are true threats under [18 U.S.C. §.] 875 and whether they were enacted with a purpose . . . to threaten or injure . . . .

In two of the government's exhibits, Exhibits 128 and 129, Hagar specifically threatened to shoot people. The court overruled Hagar's motion.

A district court's evidentiary rulings are reviewed for abuse of discretion. *See United States v. Ashraf*, 628 F.3d 813, 826 (6th Cir. 2011). Admission of the firearms and ammunition found in Hagar's residence was not an abuse of discretion because the evidence was directly relevant to the elements of the cyberstalking charge and the interstate threats charges. As to the interstate charges, Hagar sent emails to the victims stating that he intended to shoot them. Possession of firearms and ammunition was direct evidence that his threats to shoot his victims were "true threats" to injure and not "merely idle or careless talk." *See* 18 U.S.C. § 875(c); *United States v. Howard*, 947 F.3d 936, 943 (6th Cir. 2020). Hagar's ability to carry out his threats to shoot people was certainly a fact "of consequence in determining" whether his communications were true threats. *See* Fed. R. Evid. 401. Violent threats go hand-in-hand with firearms and ammunition. *See, e.g., United States v. Newell*, 309 F.3d 396, 401 (6th Cir. 2002) (holding that the defendant's possession of firearms made his threats to carry out his violent threats "more than mere puffery") (cleaned up).

This is equally true for the cyberstalking count. That count required the government to prove that Hagar "engaged in a course of conduct with the intent to kill, injure, harass, or intimidate" R.G. or members of her family. Hagar threatened to hurt R.G. and others. He also made handwritten notes about R.G.'s family. The possession of instruments to carry out such threats is certainly relevant to the question of intent. *See United States v. Walker*, 665 F.3d 212, 230 (1st Cir. 2011) ("murder kit" containing a knife, rubber gloves and duct tape was "unarguably relevant" to show intent in interstate stalking case).

Any prejudicial effect to Hagar did not outweigh its probative value. *See* Fed. R. Evid. 403. Hagar barraged his victims with extremely threatening communications, which they perceived as real, as reflected by the security measures they took. The firearms and ammunition

provided direct evidence that the victims' perception that Hagar meant what he said was not unfounded.

### D. Stalking Order

Hagar's cyberstalking charge included a specification that he committed that offense while "in violation of a protection order as that term is defined by" 18 U.S.C. § 2266(5). Section 2266(5) defines a protection order to include "any injunction, restraining order . . . issued by a civil or criminal court for the purpose of preventing contact or communication with or physical proximity to, another person, including any *temporary* or final order . . . ." 18 U.S.C. § 2266(5) (emphasis added). Hagar contends that the district court should have granted his motion for judgment of acquittal because the temporary stalking order was not valid under Oregon law. He claims that the temporary stalking order was not valid because he did not receive a copy of the petition when he was served with the temporary order, as required by ORS § 30.866(2). *See* ORS § 30.866(2) (stating that "[t]he petition and the temporary order shall be served upon the respondent with an order requiring the respondent to personally appear before the court to show cause why the temporary order should not be continued for an indefinite period").

Notwithstanding, the face of the temporary order, which Hagar admits he received, informed him that it "remained in effect" as of May 5, 2016, pending adjudication of its "indefinite" status. M.M., the Oregon prosecutor Hagar threatened, testified that temporary protective orders "will always stay in place" in the meantime.[6] Moreover, the plain language of § 2266(5) includes "any *temporary* . . . order issued by a civil or criminal court." *L.E.A. v. Taylor* does not support Hagar's argument. It holds simply that a defendant must receive the temporary

---

[6] M.M. explained that had Hagar failed to receive the petition along with the temporary protective order, "[h]is remedy would have been to show up in court at the date and time listed on the order, and ask the Court for the petition and tell the court . . . [that] service was deficient" and seek an extension.

order and underlying petition before a court may issue a *final* protective order. 377 P.3d 692, 693 (Or. App. 2016).

Hagar does not otherwise argue sufficiency of the evidence, nor should he. The record established that (1) R.G. obtained a temporary stalking protective order on May 5, 2016; (2) the police served him with it on May 9; (3) the order directed Hagar to "stop any contact" and to not "attempt to make contact" with R.G.; (4) Hagar was ordered to appear on June 3 for a show cause hearing; and (5) the temporary order clearly stated that it "remained in effect" from May 5, 2016, pending the hearing on June 3, 2016. Hagar contacted R.G. many times after being served with the temporary protective order, including the June 2 SHOOT email. Because Hagar threatened R.G. after being served with the temporary protective order, his Rule 29 motion was properly denied.

### E. Sentencing Issues

We review criminal sentences for procedural and substantive reasonableness. *Gall v. United States*, 552 U.S. 38, 51 (2007).

### 1. Procedural Reasonableness

Hagar claims that the district court erred in applying a six-level enhancement pursuant to U.S.S.G. § 2A6.1(b)(1) because he never intended to carry out any of the threats. In support he points to his trial testimony stating that he never intended to act on his threats and sent the messages simply to scare his victims because "[he] was frustrated by that time." Hagar also argues that he should not have received a two-level enhancement under USSG § 2A6.1(b)(3) because he did not commit an offense in violation of a lawful court protection order. These are both procedural-reasonableness challenges. *See United States v. Rayyan*, 885 F.3d 436, 440–41 (6th Cir. 2018) (a claim that the district court improperly applied a sentencing enhancement is a claim that the court

incorrectly calculated the applicable advisory Guidelines range, which is a claim of procedural error).

Section 2A6.1(b)(1) provides that the base level be increased by six "if the offense involved any conduct evidencing intent to carry out [the charged] threat." USSG § 2A6.2(b)(1). Section 2A6.1(b)(3) provides for a two-level increase "if the [threats] offense involved the violation of a court protection order." USSG § 2A6.1(b)(3). The § 2A6.1(b)(1) enhancement can only be applied if the defendant engaged "in some overt conduct in addition to making the threats." *Newell*, 309 F.3d at 404.[7]

Regarding the § 2A6.1(b)(1) enhancement, the district court found that "from listening to all the testimony here . . . not only numerous e-mails and other threats, but the fact of his actions and activities of driving to places where he knew he was not to be, and all under Section 2A seems to me to fit right into this enhancement." The court added that "just by the fact that he was apprehended before any of these things could be acted out is probably not dispositive . . . but . . . there's plenty of evidence to show that this enhancement applies."

Ample evidence supports the district court's finding that Hagar had the intent to carry out his threats. As discussed above, Hagar equipped himself with the means to carry out the threats contained in his rapid-fire invectives. More disturbing, Hagar conducted reconnaissance on his

---

[7] As Hagar correctly notes, in *Newell*, the defendant purchased the handgun the same day that he made the threat. *Newell*, 309 F.3d at 401. That factor is not dispositive, as reflected by the analysis in *Newell* itself, which relied on a Seventh Circuit decision, a case much like our own:

> In *United States v. Carter*, 111 F.3d 509 (7th Cir.1997), the Seventh Circuit held that the defendant's sentence was properly enhanced based upon his intent to carry out his threats where the defendant had in his possession a Colt .45 semi-automatic pistol and three loaded, matching magazines at the time of his arrest. *Id*. at 513. The court concluded that the "fact that [the defendant] actually owned and carried firearms shows an easy ability to carry out his threatened violence, making his threats more than mere puffery." *Id*. at 514 (citations omitted). In addition, the court found the enhancement to be supported by the fact that, even though the defendant lived in a different city, he knew where the victim lived and how to find her. *Id*.

*Id*.

targets, making unwelcome visits to his former workplaces, and, even more bone-chilling, collecting location information on his targets. The six-level increase was warranted. The two-level increase under USSG § 2A6.1(b)(3) was equally justified because, as discussed above, Hagar committed the offense of cyberstalking while subject to a valid temporary protective order.

### 2. Substantive Reasonableness

Hagar also claims that the 180-month sentence imposed, which was 19 percent above the top of the advisory Guidelines range, is "too long." Such substantive reasonableness challenges are reviewed for abuse of discretion. *See Rayyan*, 885 F.3d at 442.

The district court made its reason for the above-Guidelines sentence clear: a 180-month sentence was necessary to protect the public from Hagar. The court's concern for the public's safety is self-evident. The district judge, along with the jury, heard voluminous evidence of Hagar's enmity towards former coworkers, the supplies he possessed to carry out his bitter intentions, and his efforts to find several of his targets. And, as the district court found after listening to Hagar's testimony, Hagar displayed no remorse. Given that we live "in a day and time when . . . workplace shootings appear to be commonplace" and all Americans live in "a culture of fear," the district court's decision to vary upwards from the Guidelines range to 180 months was prudent to say the least.

The court also considered the effect on Hagar's victims; the emotional trauma, past, present, and future, as well as the financial cost to Eaton and Goodyear. *See United States v. Bowker*, 372 F.3d 365, 390–91 (6th Cir 2004), *vacated on other grounds,* 125 S. Ct. 1420 (2005) (holding that an above-Guidelines sentence under USSG § 5K2.3 for "extreme psychological injury" to victim in stalking case was substantively reasonable). The district court expressed a

particular concern for R.G., noting that she was "sentenced to a lifetime of psychological trauma and damage."

In short, this "reasoned judgment" by the district court to sentence Hagar to 180 months' imprisonment, far from the public and his victims, is entitled to deference. *See United States v. Johnson*, 934 F.3d 498, 502 (6th Cir. 2019).

**III.**

Hagar's conviction and sentence are **AFFIRMED.**