Carl E. Fallin was convicted in the municipal court of the City of Huntsville ("the City") of third-degree harassment, a violation of §13A-11-8(a)(1)(b), Ala. Code 1975, as adopted for enforcement by the City of Huntsville, Ordinance § 18-1 of the Huntsville Code of Ordinances 1982. Fallin appealed that conviction to the Circuit Court of Madison County. Following a trial de novo, Fallin was again convicted of harassment in the third degree, and he was sentenced to three months in the Huntsville city jail. That sentence was suspended for one year: Fallin was ordered to complete 240 hours of community service at 20 hours per month in the Madison County Work Release Program; was ordered to pay various fines and court costs; and was ordered to serve the balance of his sentence on supervised probation.
The evidence adduced at trial indicated the following. On April 9, 2001, Fallin met with James Embry, the principal of Lee High School in Huntsville, to discuss Fallin's objections to the process used to select varsity cheerleaders.[1] When Embry refused to change the process to allow Fallin's daughters to make the varsity cheerleading squad, Fallin told him that "the blood would be on [his] hands." (R. 48.) Later that same day, Fallin went to the school gymnasium, where cheerleading coach Gail Johnson was conducting a get-acquainted meeting on the balcony. Fallin's younger daughter announced that she was quitting cheerleading because of the way she and her sister had been treated. After his daughter's announcement, Fallin began yelling and pointing at Johnson. He said that he was taking both of his daughters out of cheerleading and that the coach was crazy and dangerous to children. He took three or four steps toward Johnson and the cheerleaders, and they backed away. He then made the following statements to the coach: "This isn't over"; "I'll have my foot up your butt"; and "I'll be on you like white on rice." (R. 154.) Fallin left after the mother of one of the other cheerleaders told him to leave the gymnasium. Fallin testified that he had *Page 475 
meant by his statements that the principal was responsible for any harm to the children and that he intended to seek additional remedies from school management regarding the cheerleading situation. Fallin was charged with third-degree harassment.
 I.
Fallin first contends that the trial court erred in denying his motion for a judgment of acquittal, made at the close of the City's case. Specifically, he argues that the motion should have been granted because, he says, his statements did not constitute "fighting words" and, therefore, he claimed, could not support a conviction for harassment.
The complaint charged Fallin with violating "city ordinance 18-1
adopting [C]ode of Alabama, [§] 13A-11-8(a)(1)(b)." (C. 5.) Section13A-11-8, Ala. Code 1975, provides, in pertinent part:
 "(a)(1) Harassment. A person commits the crime of harassment if, with intent to harass, annoy or alarm another person, he or she either:
 "a. Strikes, shoves, kicks, or otherwise touches a person or subjects him or her to physical contact.
 "b. Directs abusive or obscene language or makes an obscene gesture towards another person."
Historically, this Court has held that the "abusive or obscene language" provision of Alabama's disorderly conduct and harassment statutes was limited to "fighting words." See, e.g., Conkle v. State,677 So.2d 1211 (Ala.Crim.App. 1995); R.I.T. v. State, 675 So.2d 97
(Ala.Crim.App. 1995); B.E.S. v. State, 629 So.2d 761 (Ala.Crim.App. 1993); Robinson v. State, 615 So.2d 112 (Ala.Crim.App. 1992). "[Fighting words] by their very utterance provoke a swift physical retaliation and incite an immediate breach of the peace." Skelton v. City of Birmingham,342 So.2d 933, 936-37 (Ala.Crim.App.), remanded on other grounds,342 So.2d 937 (Ala. 1976). "`The test is what men of common intelligence would understand would be words likely to cause an average addressee to fight.'" Chaplinsky v. New Hampshire, 315 U.S. 568, 573 (1942), quotingState v. Chaplinsky, 91 N.H. 310, 320, 18 A.2d 754, 762 (1941). The words "`must be sufficiently offensive to raise a probability of physical retaliation by the addressee or someone acting in his interest.'"B.E.S., 629 So.2d at 765, quoting A.L.I. Model Penal Code § 250.4 at 365-66 (1980). However, each of those cases, and indeed, nearly all of the published cases in Alabama, were authored before the Alabama Legislature's 1996 amendment to the harassment statute.[2]
The 1996 amendment added subsection (a)(2) to § 13A-11-8, Ala. Code 1975. Section 13A-11-8(a)(2) provides that "[f]or purposes of this section, harassment shall include a threat, verbal or nonverbal, made with the intent to carry out the threat, that would cause a reasonableperson who is the target of the threat to fear for his or her safety." (Emphasis added.)
In Conkle, this Court, with Presiding Judge Taylor and Judge Long filing special concurrences, Judge Patterson concurring in the result, and Judge Cobb dissenting, stated that the words "I'm going to get you, little girl. You're as good as dead," spoken by the appellant from his car as he drove past the complainant, did not constitute harassment.Conkle, 677 So.2d at 1213. However, that case was *Page 476 
decided before the 1996 amendment of the harassment statute by the Alabama Legislature.
Indeed, Judge McMillan, who authored the opinion of the Court inConkle, stated, "under current law in Alabama, a verbal threat alone, in circumstances that would not cause public disorder or unrest by being likely to start a fight, does not constitute an offense." Conkle, 677 So.2d at 1219 (emphasis added). Judge Long, in his special concurrence, stated:
 "I am troubled that our laws will countenance an intentional threat that places another person in reasonable fear for his or her safety. It seems peculiar to me that while our anti-stalking law recognizes the real harm caused by a credible threat when made in conjunction with repeated following or harassing behavior, there is no law comprehending the harm caused by a credible face-to-face threat standing alone. See § 13A-6-90 et seq., Ala. Code 1975. Even more peculiar, under § 13A-8-11(b)(1), a communication by telephone or mail, made with the intent to alarm another person, is considered a criminal act. Thus, apparently it is illegal to threaten someone over the telephone, but perfectly legal to threaten to kill someone in person. This court, however, does not write the laws."
677 So.2d at 1219. Judge Cobb, in her dissent in Conkle, wrote, "If, upon further review, the majority remains successful, then the question of affording our citizenry protection from substantial threats of violence should be addressed by the Alabama Legislature as has been done in other states." Conkle, 677 So.2d at 1220.
We conclude that the Alabama Legislature, in enacting the 1996 amendment to the harassment statute, appears to have done exactly as several members of this Court in Conkle prevailed on it to do. The Alabama Supreme Court recognized this in Ex parte N.W., 748 So.2d 190,193 (Ala. 1999), as a part of a discussion concerning whether harassment was a lesser offense to the offense of menacing. In a footnote, the Court stated:
 "We note that there is some ambiguity as to whether § 13A-11-8(a)(2) is merely a clarification of subsection (a)(1), requiring the prosecution to establish the elements of (a)(1), or is a completely separate definition of the offense, requiring only the establishment of the elements in (a)(2). Because only subsection (a)(1) contains the traditional language identifying the elements of a criminal offense — `A person commits the crime of harassment if . . .' — we adopt the former construction for the purposes of this appellate review."
748 So.2d at 193 n. 3. Therefore, we hold that a person commits the crime of harassment if, with the intent to harass, annoy, or alarm another person, he or she strikes, shoves, kicks, or otherwise touches that person or subjects him or her to physical contact; directs abusive or obscene language or makes an obscene gesture towards that person; or makes a threat against that person, verbally or nonverbally, with the intent to carry out the threat, that would cause a reasonable person who is the target of the threat to fear for his or her safety. Thus, we conclude that, in certain situations — i.e., where the words or actions are manifested in the form of a threat — a person may commit the crime of harassment even if the words do not rise to the level of "fighting words." We note that abusive or obscene language must still amount to "fighting words" in those situations where the language is merely offensive or distasteful, but does not constitute a threat.
We are now faced with the type of situation contemplated by the Legislature when it drafted the amendment to § 13A-11-8. *Page 477 
Here, viewing the testimony in the light most favorable to the State, as is the standard of review when an appellant has challenged the sufficiency of the evidence, the record indicates that Fallin, a large man, was yelling at Johnson, waving his arms and pointing his finger at her as he approached her, saying that she was crazy and that she was a threat to the cheerleaders in her care. The record further indicates that as Fallin approached Johnson, he said, "This is not over yet . . . I'm going to put my foot so far up your butt that it will be like white on rice." (R. 154.) Johnson testified that she was placed in fear and that she thought she was going to have to fight "because [Fallin] kept coming at [me]." (R. 156.) Subsection (a)(2) provides that the state of mind of a reasonable person in the same situation in which the victim finds himself or herself is the governing standard.[3] In the present case, although it was undisputed that Fallin remained at least 10 feet from Johnson, that he made no moves as if to strike her, and that he had nothing in his hands with which to cause her harm, Johnson's testimony clearly satisfies the elements of harassment under the statute as it reads today. Johnson testified that she was "afraid for [her] safety" (R. 195), that she and the cheerleaders began retreating, and that she thought she might have to "defend [her]self" (R. 156). Johnson further stated that during the confrontation she was "visibly shaking . . . [a]nd [that she] was terrified." (R. 198.) Whether Johnson's fears were reasonable[4] was a question for the jury; it was for the jury to render a verdict based on the evidence presented at trial and the law as defined by the trial court.
Additionally, we note that the fact that the complaint did not specifically list § 13A-11-8(a)(2) as the statute being violated is not fatal. As a clarification of subsection (a)(1), and not a separate offense, subsection (a)(2) would not have to be listed in the complaint.[5] See Ex parte N.W., supra.
The trial court gave a jury instruction containing the language of subsection (a)(2), and Johnson testified that Fallin's words and actions placed her in fear for her safety. Whether Fallin intended to harass, annoy, or alarm Johnson; whether he intended to carry out his threats; and whether it was reasonable for a person in Johnson's position to have been placed in fear for her safety were questions that were properly submitted to the jury. Therefore, the trial court properly denied Fallin's motion for a judgment of acquittal.
 II.
Fallin also contends that the trial court erroneously allowed prior statements *Page 478 
made by him to be introduced into evidence. In a pretrial motion in limine, Fallin asked the trial court to exclude evidence of a prior statement that he had made to Principal Embry the morning of the incident; that motion was denied. At trial, Principal Embry testified that Fallin had asked him to use his daughters' cheerleading scores from the previous year, thus justifying their being placed on the cheerleading squad for the upcoming year. Principal Embry testified that when he told Fallin that he could not do that because it would not be fair to use different criteria for some girls to determine who made the cheerleading squad, Fallin became visibly displeased and left his office. Principal Embry testified, over Fallin's objections, that Fallin said "that the blood would be on my hands. And if I didn't go along with his suggestions, that the blood would be on my hands." (R. 48.)
Rule 404(b), Ala.R.Evid., provides, in pertinent part:
 "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ."
Evidence indicating that on the day of the incident and at the conclusion of a conversation about Johnson and the cheerleading squad, Fallin had stated "the blood is on [Embry's] hands" if he did not allow Fallin's daughters' cheerleading scores to be graded differently in order to allow them to be on the squad was clearly admissible to show Fallin's intent, an essential element of the crime of harassment. Fallin citesHunter v. State, 802 So.2d 265 (Ala.Crim.App. 2000), to support his contention that the statements were inadmissible. However, Hunter is easily distinguishable from the facts here. In Hunter, evidence was introduced concerning an uncharged, dissimilar, and unrelated robbery that had occurred two weeks prior to the robbery for which Hunter was charged. This Court held that that evidence was not admissible to prove intent because it "did not logically lead to an inference that Hunter, because he had allegedly committed the prior robbery, had the prerequisite intent to commit the now-charged crimes at the time they were committed." Hunter, 802 So.2d at 270. Here, unlike the evidence complained of in Hunter, the statements Fallin made to Principal Embry logically lead to an inference that Fallin had the prerequisite intent to seek Johnson out and confront her, which he did that same day. The trial court did not err in allowing the statements into evidence.
Based on the foregoing, the judgment of the trial court is affirmed.
AFFIRMED.
McMILLAN, P.J., and COBB, BASCHAB, and WISE, JJ., concur.
[1] Both of Fallin's daughters were junior varsity cheerleaders, but they had not been selected for the varsity squad.
[2] The trial court also correctly noted this fact when Fallin cited many of these cases in his motion to dismiss the complaint and during the arguments on his motion for a judgment of acquittal.
[3] Johnson stated that she was not moved by Fallin's words to attack him. However, an actual attack or retaliation has never been a requirement for a conviction, even one based solely on the use of "fighting words."
[4] The only other people in the gymnasium were the cheerleaders and some of the mothers. We note that several of those witnesses stated that they feared Fallin and had backed away from him. One of the witnesses testified that she began to move toward Fallin as he approached Johnson and the cheerleaders because her daughter was in the group of cheerleaders standing near Johnson. (R. 123.) That same witness testified that the mother of another cheerleader actually confronted Fallin, ordered him to leave the gym, and then telephoned the police. This testimony certainly lends credence to the jury's apparent finding that Johnson's fears were reasonable.
[5] The fact that the ordinance was enacted before the 1996 amendment is irrelevant because § 18-1, Huntsville Code of Ordinances 1982, contains "now existing or hereafter enacted" language sufficient to encompass the 1996 amendment to § 13A-11-8(a), Ala. Code 1975. *Page 1161