Rel: February 20, 2026

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2025-2026

_____

### CL-2025-0694

_____

### K.K.

### v.

### J.K.

### Appeal from Etowah Circuit Court
### (DR-25-221.90)

FRIDY, Judge.

K.K. ("the son") appeals from a protection-from-abuse order ("the protection order") that the Etowah Circuit Court ("the trial court") entered against him pursuant to the Elder Abuse Protection Order and Enforcement Act ("the Act"), § 38-9F-1 et seq., Ala. Code 1975, at the

request of J.K. ("the mother"). For the reasons set forth herein, we reverse the protection order.

Background

The mother, who was eighty-five years old, filed a preprinted-form petition for protection from elder abuse against the son on June 25, 2025. In her petition, she included a handwritten notation that the son had "mentally" threatened her through a series of e-mails, that she feared for her life, and that the son's conduct had caused her emotional and mental anguish. She also checked boxes on the form indicating that she was requesting an order restraining and enjoining the son from harassing, annoying, telephoning, threatening, or otherwise engaging in conduct that would place her in reasonable fear of bodily injury.

The same day, using a preprinted form, the trial court entered an ex parte elder-abuse protection order ("the ex parte order") that restrained and enjoined the son from harassing, stalking, annoying, contacting, telephoning, or communicating with the mother and from threatening or engaging in conduct that would place the mother in reasonable fear of bodily injury. The ex parte order required the son to stay away from the mother and her residence. It further prohibited him

2

from transferring, concealing, encumbering, or otherwise disposing of joint bank accounts that he and the mother held at Regions Bank and joint accounts that they held at Edward Jones, a financial advisor. The ex parte order also prohibited the son from transferring to any person other than the mother, or from exercising control over, the mother's personal property, including but not limited to money, belongings, or other assets. The prohibition included exercising any authority that he may have been granted under a power of attorney over the mother. The trial court determined that the relief was necessary to ensure the mother's safety and welfare.

The trial court conducted the trial on July 23, 2025. At the outset, the trial court instructed the parties, who had been sworn, that the proceeding would not devolve into "a screaming match back and forth across the table" and warned them to refrain from making comments, gestures, or remarks during testimony.

Appearing pro se, the mother introduced into evidence a single exhibit comprising e-mail correspondence between her and the son from October 29, 2024, to June 24, 2025, that showed that the mother had forwarded certain e-mails to the son's then-wife during their divorce

proceedings. The exhibit showed that, on January 5, 2025, the mother e-mailed the son asking him to check his text messages. In the ensuing e-mail conversation, the son responded that he would communicate with her only by e-mail, that he wanted no communication with her beyond what was necessary, and that he wanted to move on without her influence. The mother replied that the son was sick, that she was worried about him, and that the only way she could "move away" from him would be for her to die. The son denied being sick, warned the mother to stop sending what he described as "nasty, venomous emails," and wrote that he would block her if the communications continued. The mother responded that the son had become sick because of his divorce and that he should hope others did not learn how he was acting.

The exhibit showed that, on January 8, 2025, the mother e-mailed the son asking whether he was still alive and that the son responded that he was "all great." Shortly thereafter, the son sent an e-mail to the mother with the subject line "please do not contact me again for any reason." In that e-mail, the son stated that either the mother or his neighbors had contacted the police after the mother had left his

4

apartment, he had instructed her not to return, and he had stated that he did not want her in his life.

The exhibit reflected that, on March 7, 2025, the mother e-mailed the son stating that, if he continued to refuse to communicate with her, she would contact others, including an attorney, to determine whether he was well. The son's response indicated that any further contact from her would result in him permanently blocking her, warned that he would seek a restraining order against her, and informed her that he never intended to speak with her again. The exhibit reflected that, on June 13, 2025, the son e-mailed the mother instructing her never to come near him or to contact him, accusing her of lying to a judge, and threatening to have her jailed if she came near him. He further stated that his attorney had a restraining order prepared.

The mother testified that the son had threatened her in the most recent e-mail he had sent to her. She identified an e-mail titled "Involuntary Commitment" ("the final e-mail") in which the son accused her of betraying him by having him involuntarily committed for four days, asserted that her commitment paperwork was inaccurate, and demanded that she immediately contact her attorney to dismiss the

5

commitment matter. In the final e-mail, the son warned the mother that if she did not comply with his demand, he would pursue legal action against her, including seeking a mental evaluation of her and initiating proceedings to determine her capacity to care for herself.

At the trial, the mother testified that she was afraid of the son. When asked to explain the basis for her fear, she testified that the son was "mentally sick" and that she was afraid of what he might do. She described the son as "volatile" and testified that she feared he could "come over" and "kill somebody or himself" if he did not receive help. When asked by the trial court why she believed the son would harm her, she responded: "[B]ecause he's dangerous." She testified that the son refused to admit that he was sick, and, she said, he would not seek help. She further testified that she was moving out of town, that she did not care if the son moved out of state, and that she did not want him near her because he became angry and, she said, did not know what he was doing.

When asked what she meant by "sick," the mother testified that the son was "mentally sick" and that he had been diagnosed with "PST," by which she appears to have meant "PTSD," or post-traumatic stress disorder. She testified that the son had made several statements in court

"under a lot of stress," although it is unclear which court proceeding the mother was referencing, that she had added more stress to him, and that he therefore wanted nothing to do with her. She further testified that he began sending "ugly emails" to her that were "not threatening to anybody but" her. When the trial court asked her the type of threats the son had made in the e-mails, the mother identified the threats as statements in which he wrote that he would have her committed and would hire an attorney. When the trial court asked the mother to specify the threats that caused her to fear for her life, she again identified statements in the e-mails indicating that the son would pursue legal action and seek to have her mentally evaluated. She testified that she had nothing further to add beyond what appeared in the e-mails.

The mother testified that she had done everything she could to get the son the help that she believed he needed, including having him involuntarily committed. She stated that, following the commitment, a judge released the son to the same providers he had been seeing at a facility operated by the United States Department of Veterans Affairs ("the VA") for approximately three and a half years, and, she said, those providers did not hospitalize him or provide him with meaningful help.

She further testified that the son smokes marijuana throughout the day, and, she said, the VA provides advance notice of drug testing, which, she said, caused her fear because she did not know what he might do.[1]

The son testified that he did not speak to his mother for six months "for the very reason she came to [his apartment] uninvited" shortly after he was released from jail. It is unclear from the record why the son had been in jail. The son testified that the mother had appeared at his apartment uninvited, that he had refused to let her inside because she said that she would go to a judge to have him committed, which she later did, and that he told her to "please leave [him] alone." He testified that, after the mother had left his apartment, his neighbors called the police, and that six police officers then came to his apartment and pointed guns at him. It is unclear what prompted the neighbors to call the police. He further testified that the mother had provided false information, including claims that he was divorced and stalking his former wife; however, the record does not indicate to whom she made those allegedly

_____

[1]The son's attorney stated that he possessed records from the VA and records compiled during the son's commitment showing that the son was released after several days with no findings that he posed a danger to himself or others. However, the medical records were not admitted into evidence.

false statements. The son testified that the mother had previously threatened his siblings with commitment, just as she had done to him.

The son denied threatening the mother and testified that he had supported her after his siblings had died and had helped her move four times. The son testified that he was sixty years old, was fully independent, and was receiving treatment for anxiety and depression. He testified that the e-mails that the mother had submitted to the trial court expressed his belief that the mother was a bad parent and that he blamed her for family events but that he had not threatened her.

The son's attorney argued to the trial court that the e-mails reflected only threats of legal action in response to the mother's legal actions against the son and that the son had no history of violence, homicidal tendencies, or self-harm to support the mother's allegations. The son's attorney acknowledged that the e-mails were unpleasant but argued that they merely discussed childhood trauma and contained nothing threatening or improper. The son's attorney also argued that the son "is leaving tomorrow to close on a house, and he'll be out of this state" with no plans to return.

The record contained evidence indicating that the mother owned property in Pensacola, Florida ("the river lot"), that she had purchased for the son. There was apparently a dispute between the mother and the son regarding the river lot, but the specific nature of that dispute is not clear from the record. In an e-mail dated December 23, 2024, the son asked the mother what he owed her for her portion of the river lot and stated that he would pay her once he could do so under the terms of his divorce proceedings.

The exhibit showed that, on January 3, 2025, the son e-mailed the mother stating that her keeping the river lot was "no problem" but that he needed to know her intentions so that he could make other arrangements. The mother responded that the issue between them needed to be resolved before moving forward and stated that she was "trying to get [his] attention." She further stated that the river lot belonged to him and that she had attempted to make amends during a prior visit. The son replied that he would find another property to purchase, would transfer $10,400 from his checking account to the mother's checking account -- although the record does not explain the purpose of that transfer -- and would drop off her "papers" because he

10

would not be "held hostage" by her. The mother responded that she did not want the money or the river lot, denied holding anyone hostage, and stated that she was trying to find peace.

The exhibit reflected that, on January 9, 2025, the mother e-mailed questions to the son, saying that she was attempting to understand why he was angry. Once again, the son responded that he was not interested in personal communication or social contact with her and that he wanted no involvement with her beyond what was required and instructed her to remove him from financial accounts if she wished. He wrote that he wanted the mother to remove him from her car, that he intended to remove the mother from his car, although the record does not clarify whether he was referring to the insurance or title on the vehicle, and that he was requesting a signed and witnessed document reflecting the mother's intent to sell the river lot to him if that remained her intent. The exhibit reflected that, on January 15, 2025, the son again e-mailed the mother to request written confirmation of the mother's agreement to sell him the river lot and the agreed price. The mother responded that she agreed to sell the river lot to the son for the price she paid for it and later sent another e-mail reconfirming that agreement.

11

The exhibit showed that, on February 5, 2025, the son e-mailed the mother to request the total purchase price of the river lot so that he could arrange payment and later explained that, once the mother provided the amount, she could sign a deed at an attorney's office and that he would transfer the funds to her. The exhibit further showed that, on June 2, 2025, the son e-mailed the mother stating that she could keep the river lot, that he was leaving and she would never hear from him again, that he was "taking [her] off everything [he] can," and that she was the "worst human" he knew. In that e-mail, he further stated that the mother had his "prized dog" and asserted that the dog would die because, according to him, she was "lazy" and "fat" and would not walk the dog.

The mother testified at the trial that she needed the son removed from her financial accounts because they were co-owners on certain accounts and that she had paperwork requiring his signature to remove him from those accounts. She further testified that she had purchased the river lot for the son so that he could build a house, that she is now "stuck with" the river lot, and that she "gave him more money than that, the property value." The mother testified that the river lot belonged to her and that the son did not currently possess any of her property.

The son testified that the mother had asked him to be included on her financial accounts and that he had later attempted to remove his name from those accounts because, he said, she was a bad credit risk. The son's attorney advised the trial court that the son would sign documents to remove himself from the accounts and that the e-mails showed his efforts to end all financial entanglements with the mother. The son's attorney further asserted that the son never mismanaged, took, or used the mother's money and that the son would sign any documents presented because he did not want the money. At the conclusion of the hearing, the mother asked the son to sign documents, and the son responded that he would not do so until his attorney reviewed them.

On August 4, 2025, the trial court entered the protection order, granting the mother's petition for a "perpetual duration." The trial court restrained and enjoined the son from committing acts of abuse as defined by the Act, from harassing or communicating with the mother, from stalking her, and from engaging in conduct that would place her in reasonable fear of bodily injury. The protection order also excluded the son from the mother's residence and prohibited him from possessing or

exercising control over her assets or disposing of them to any person other than the mother.

The son moved to alter, amend, or vacate the protection order on August 15, 2025. He argued that the mother had failed to prove elder abuse, that the evidence showed only a strained relationship arising from divorce-related disputes and property disagreements, and that the e-mails did not support the trial court's findings. He further argued that the protection order was against the great weight of the evidence, constituted an abuse of discretion, and imposed restrictions broader than necessary.

The trial court denied the postjudgment motion on August 18, 2025. The son timely filed a notice of appeal.

### Standard of Review

Because the trial court received evidence ore tenus, appellate review is governed by the following principles:

> "'"'"'"[W]hen a trial court hears ore tenus testimony, its findings on disputed facts are presumed correct and its judgment based on those findings will not be reversed unless the judgment is palpably erroneous or manifestly unjust."'" Water Works & Sanitary Sewer Bd. v. Parks, 977 So. 2d 440, 443 (Ala. 2007) (quoting Fadalla v. Fadalla, 929 So. 2d 429, 433 (Ala. 2005), quoting in turn Philpot v. State, 843 So. 2d 122, 125 (Ala. 2002)). "'The presumption of correctness,

14

however, is rebuttable and may be overcome where there is insufficient evidence presented to the trial court to sustain its judgment.'" Waltman v. Rowell, 913 So. 2d 1083, 1086 (Ala. 2005) (quoting Dennis v. Dobbs, 474 So. 2d 77, 79 (Ala. 1985)). "Additionally, the ore tenus rule does not extend to cloak with a presumption of correctness a trial judge's conclusions of law or the incorrect application of law to the facts." Waltman v. Rowell, 913 So. 2d at 1086.'"'"

P.T.S. v. S.S., 406 So. 3d 109, 113 (Ala. Civ. App. 2024).

## Analysis

The purpose of the Act, among other things, is to "create a flexible and expeditious method of obtaining a protection order against an individual who has committed elder abuse." § 38-9F-2(2), Ala. Code 1975. The Act defines "elder abuse" as

"[t]he commission of any of the following acts or the intent to commit any of the following acts against an elderly person:

"a. Abuse, as defined in Section 38-9-2.

"b. Arson, as defined in Sections 13A-7-40 to 13A-7-43, inclusive.

"c. Assault, as defined in Sections 13A-6-20 to 13A-6-22, inclusive.

"d. Criminal coercion, as defined in Section 13A-6-25.

"e. Criminal trespass as defined in Sections 13A-7-2 to 13A-7-4.1, inclusive.

15

"f. Emotional abuse, as defined in Section 13A-6-191.

"g. Financial exploitation, as defined in Sections 13A-6-191 and 8-6-171.

"h. Harassment, as defined in Section 13A-11-8.

"i. Kidnapping, as defined in Sections 13A-6-43 and 13A-6-44.

"j. Menacing, as defined in Section 13A-6-23.

"k. Reckless endangerment, as defined in Section 13A-6-24.

"l. Sexual abuse, as defined as any of the acts in Sections 13A-6-60 to 13A-6-68.

"m. Stalking, as defined in Sections 13A-6-90 to 13A-6-91.1, inclusive.

"n. Theft, as defined in Sections 13A-8-2 to 13A-8-5, inclusive.

"o. Unlawful imprisonment, as defined in Sections 13A-6-41 and 13A-6-42."

§ 38-9F-3(2), Ala. Code 1975. The Act defines an "elderly person" as a "person 60 years of age or older." § 38-9F-3(4).

The son argues that the evidence did not support a finding that he had committed, attempted to commit, or intended to commit any act constituting "elder abuse" under the Act. He asserts that the trial court

16

improperly focused on a single e-mail referencing potential litigation and a mental-health evaluation and contends that the e-mail did not threaten harm. According to the son, the final e-mail sought the retraction of allegedly false statements -- a requirement if he wanted to pursue punitive damages in a defamation action against the mother -- and therefore did not constitute abuse under the Act.

The son further emphasizes that the e-mail correspondence shows that he repeatedly asked his mother to leave him alone while she continued to initiate contact. He argues that the trial court misapplied the Act's definition of elder abuse, entered a protection order without sufficient proof, and failed to identify the specific act or acts of elder abuse that he allegedly committed.

Because a final elder-abuse protection order requires proof by a preponderance of the evidence, see § 38-9F-7(a), Ala. Code 1975, the dispositive question is whether the evidence presented at trial was sufficient to establish elder abuse as defined by the Act. We conclude that it was not.

The mother argues in her appellate brief that the evidence supported findings of financial exploitation, emotional abuse, and

17

harassment.[2] Based on the record, those asserted acts appear to be the only potential grounds of elder abuse that could form the bases for the trial court's entry of the protection order. However, as discussed herein, the evidence does not support any of those grounds.

Under § 38-9F-3(2)g. of the Act, "financial exploitation" is defined by reference to § 13A-6-191, Ala. Code 1975, a part of the criminal code, which, as relevant here, requires proof that a person used "deception, intimidation, undue influence, force, or threat of force to obtain or exert unauthorized control over an elderly person's property with the intent to

---

[2]The mother actually argues that the protection order could be sustained by evidence of "harassing communications," rather than harassment, but the Act provides for "harassment" rather than "harassing communications" as a ground for elder abuse. We recognize that, under a similar act, the Protection from Abuse Act, § 30-5-2 et seq., Ala. Code 1975, we have considered "harassing communications" as a type of "abuse" that could support the entry of a protection-from-abuse order. See M.R.E. v. M.J.E., 321 So. 3d 1259, 1266 (Ala. Civ. App. 2020). However, that act, in defining "abuse," contains a catchall provision providing that abuse includes "[a]ny other conduct directed toward a plaintiff covered by this [act] that could be punished as a criminal act under the laws of this state." § 30-5-2(1)l. "Harassing communications" falls within this catchall provision because it constitutes a Class C misdemeanor. See § 13A-11-8(b)(2), Ala. Code 1975. The Elder Abuse Protection Order and Enforcement Act, under which the present action has proceeded, does not contain a catchall provision in defining "elder abuse," and, as a result, the acts constituting elder abuse are limited to the list contained in the definitional section of the Act, § 38-9F-3, which, in pertinent part, is set out above.

deprive the elderly person of [that] property." § 13A-6-191(5). Section 38-9F-3(2)g. of the Act also defines "financial exploitation" by reference to § 8-6-171, Ala. Code 1975, which requires proof of "[t]he wrongful or unauthorized taking, withholding, appropriation, or use of money, assets, or property of a vulnerable adult," obtaining control over the vulnerable adult's property "through deception, intimidation, or undue influence," or converting the property of the vulnerable adult "to deprive the vulnerable adult of the ownership, use, benefit, or possession of his or her money, assets, or property." § 8-6-171(5).

In this case, the evidence does not satisfy either definition of "financial exploitation." The mother testified that she and the son were co-owners on certain financial accounts and that she wanted him removed from those accounts. However, she admitted that the son did not currently possess any of her property and that she was not asking him to relinquish any property in his possession. The son, for his part, testified that he had attempted to remove himself from the mother's financial accounts, denied using or controlling her funds, and stated that he would sign any paperwork necessary to remove his name from any accounts that he was on with the mother.

The e-mail correspondence between the mother and the son corroborated the parties' testimony. The e-mails showed that the son repeatedly told the mother that she was free to remove him from her accounts, stated that he did not want involvement in her finances, and expressed a willingness to execute documents to effectuate separation of their financial affairs. Nothing in the record reflects that the son used deception, intimidation, undue influence, or threats to obtain control over the mother's property or that the son had ever taken, withheld, appropriated, used, or converted the mother's property. See § 13A-6-191(5); § 8-6-171(5).

The record also does not establish financial exploitation with respect to the river-lot transaction. The e-mails show that the mother acknowledged that she had purchased the river lot for the son's benefit and expressly agreed to sell it to him for the amount that she had paid for it. The son agreed to pay that price, proposed a routine deed transfer through a third party, and offered to cover the service costs. Those communications reflect a transaction initiated and approved by the mother -- not unauthorized control or intent to deprive by the son. See § 13A-6-191(5); § 8-6-171(5).

Turning to "emotional abuse" as a potential ground of the trial court's protective order, that phrase is defined in § 38-9F-2(2)f. of the Act by reference to § 13A-6-191, Ala. Code 1975, as the "intentional or reckless infliction of emotional or mental anguish." § 13A-6-191(4). Although the mother repeatedly testified that she feared her son and described him as "mentally sick" and "volatile," her testimony did not identify conduct of the son indicating that he had intentionally or recklessly inflicted emotional or mental anguish on her within the meaning of the Act.

Although § 13A-6-191(4) does not further define "intentional or reckless infliction of emotional or mental anguish," § 38-9D-2(3)a., Ala. Code 1975, a part of the Elder Abuse Prevention Act, § 38-9D-1 et seq., Ala. Code 1975, provides guidance, defining emotional abuse as "[t]he intentional infliction of mental or emotional anguish by threat, humiliation, intimidation, or other verbal or non-verbal abusive conduct," and offers examples such as name-calling, insulting, frightening, intimidating, ignoring for extended periods, or isolating an individual from friends and family. Those examples demonstrate that emotional abuse contemplates conduct designed to exert power, control, or

21

intimidation so as to cause psychological harm, typically through persistent or coercive behavior rather than by isolated expressions of anger or conflict.

Consistent with those principles, Alabama Elder Law commentary likewise identifies emotional abuse through behaviors such as belittling, threats, isolation, and other uses of power and control. See Hugh M. Lee, Jennifer Marshall Roden & Gaines B. Brake, Alabama Elder Law § 28:15 and § 28:17 (2023). Those indicators underscore that emotional abuse ordinarily involves a pattern or course of conduct, not a single unpleasant communication or a generalized family dispute. Applying those principles, we conclude that the evidence was insufficient to show that the son emotionally abused the mother under § 13A-6-191(4).

Indeed, a review of the evidence reflects that the mother's proof consisted primarily of her subjective generalized fear of the son and a series of e-mails in which the son expressed anger, referenced legal disputes, threatened litigation, and stated an intent to seek a mental evaluation of the mother. The mother did not testify that the son engaged in humiliation, intimidation, isolation, or other abusive conduct contemplated by § 13A-6-191(4). Although the son, on one occasion,

22

referred to the mother as "fat" and "lazy" in the context of criticizing her failure to walk his dog, that isolated remark does not rise to the level of name-calling contemplated by § 13A-6-191(4) because it was neither persistent nor part of a broader pattern of abusive conduct. Nor did she identify any specific acts by the son that could be considered intentional or reckless infliction of emotional or mental anguish beyond her subjective fear.

When the trial court asked the mother to specify the threats that caused her to fear for her safety, she identified only the son's e-mail regarding potential legal action against her and his statement that he would seek to have her mentally evaluated. The mother expressly testified that she had nothing to add beyond what appeared in the e-mails. The son denied threatening the mother with physical harm, testified that he had sought to avoid contact with the mother, and explained that the e-mails addressed ongoing legal disputes stemming from the mother's actions, including her involvement in his involuntary commitment.

Threats of legal action -- even when emotionally charged or upsetting -- do not, standing alone, constitute emotional abuse under §

23

13A-6-191(4). Cf. Wills v. Jones, 213 So. 3d 982, 984-86 (Fla. Dist. Ct. App. 2016) (holding that threatening litigation, creating a scene, and making unwanted calls -- although distressing -- were legally insufficient to support a domestic-violence injunction because they did not create an objectively reasonable fear of statutorily proscribed conduct). The e-mails reflect an abrasive relationship between the mother and the son and familial conflict, but they do not demonstrate conduct rising to the level of intentional or reckless infliction of emotional or mental anguish as contemplated by § 13A-6-191(4), particularly when the communications concerned legal disputes and both parties continued to engage one another. Accordingly, the evidence was insufficient to establish emotional abuse under the governing statutory framework.

Finally, the Act defines "harassment" by reference to § 13A-11-8, Ala. Code 1975. See § 38-9F-3(2)h. Although § 13A-11-8 contains separate provisions addressing harassment and harassing communications, the Act expressly refers to only "harassment." See § 38-9F-3(2)h. Accordingly, the relevant inquiry is confined to § 13A-11-8(a), which defines "harassment" as conduct undertaken by a person "with intent to harass, annoy, or alarm another person," by subjecting the other person to

24

physical contact or "[d]irect[ing] abusive or obscene language or mak[ing] an obscene gesture towards" the other person. Additionally, "harassment shall include a threat, verbal or nonverbal, made with the intent to carry out the threat, that would cause a reasonable person who is the target of the threat to fear for his or her safety." § 13A-11-8(a)(2).

When harassment is premised on abusive or obscene language or gestures, see § 13A-11-8(a)(1)b., Alabama courts construe § 13A-11-8(a) narrowly to avoid an interpretation of the statute that could run afoul of the First Amendment to the United States Constitution. See Miller v. City of Fairhope, 855 So. 2d 1139, 1140-41 (Ala. Crim. App. 2003). Under that narrow construction, "abusive or obscene language" applies to only "fighting words." Miller, 855 So. 2d at 1140-41. "Fighting words" are "'"'those words which have a likelihood of causing a violent response by the person to whom they are addressed.'"'" Id. at 1141 (citations omitted). They are words that, when addressed to the ordinary citizen, are -- by common knowledge and by their very utterance -- inherently likely to provoke a swift and violent retaliation and incite an immediate breach of the peace; it is not enough that they merely arouse anger,

resentment, or emotional distress, or that they constitute a socially unacceptable mode of communication. Id.

Here, the record establishes that the alleged conduct consisted almost entirely of e-mails exchanged between the parties. The mother identified no instance in which the son subjected her to physical contact, and our review of the e-mail correspondence between the parties reveals no instances of the son's use of language so extreme that it could constitute fighting words. Thus, the evidence does not support a finding of elder abuse based on harassment as that term is defined in § 13A-11-8(a)(1).

The evidence likewise fails to establish harassment based on a threat under § 13A-11-8(a)(2). According to that subsection, a threat supports a finding of harassment only if it is made with the intent to carry it out and would cause a reasonable person to fear for his or her safety. See Fallin v. City of Huntsville, 865 So. 2d 473, 476 (Ala. Crim. App. 2003). The alleged "threat" here consisted of an e-mailed statement that the son would pursue legal action or seek a mental-health evaluation of the mother. The son never threatened physical harm, never expressed an intent to injure the mother, and never suggested imminent violence.

26

Instead, the mother herself threatened to involve attorneys if the son refused to communicate with her. Threats of litigation -- particularly when invoked by both parties -- do not reasonably place a person in fear for physical safety and therefore do not satisfy § 13A-11-8(a)(2).

The surrounding circumstances further undermine any finding of an intent by the son to harass the mother. Despite her professed fear, the mother continued to initiate communication with the son, forwarded his e-mails to his former wife, appeared uninvited at his apartment, and threatened legal action if he did not respond. She never asked the son to cease contact and affirmatively stated in writing that she would "find a way to talk to" him. When the only in-person encounter had occurred, the son testified, the mother had appeared uninvited at his apartment, he had refused to let her inside, and he had asked her to leave him alone. There were no allegations of obscene language, gestures, or threats by the son during that encounter.

In sum, the record reflects mostly written communications arising from a strained family relationship and ongoing legal disputes -- not physical contact, fighting words, or threats. Thus, the evidence does not support the protective order on the ground of harassment.

<u>Conclusion</u>

We conclude that the evidence does not establish that the son financially exploited, emotionally abused, or harassed the mother or that he engaged in any other action that could be considered elder abuse within the meaning of the Act. While the mother correctly notes that a trial court's findings in an ore tenus proceeding are presumed correct, that presumption does not insulate a judgment that rests on an erroneous application of the law or is unsupported by the evidence. <u>Cahaba Veneer, Inc. v. Vickery Auto Supply</u>, 516 So. 2d 670, 674 (Ala. Civ. App. 1987). Given the lack of evidence of elder abuse in this case, the trial court erred in entering the protection order against the son. We therefore reverse the protection order and remand the case for the entry of a judgment consistent with this opinion.

REVERSED AND REMANDED.

Moore, P.J., and Edwards and Hanson, JJ., concur.

Bowden, J., concurs in the result, without opinion.